## RAILROAD COMPANY *v.* RICHMOND ET AL.

1. The act of Congress of June 15th, 1866, authorizing every railroad company in the United States, whose road was operated by steam, and its successors and assigns, to carry upon and over its road, boats, bridges, and ferries all passengers, troops, government supplies, mails, freight, and property, on their way from one State to another State, and to receive compensation therefor, and to connect with roads of other States so far as to form continuous lines for the transportation of the same to their place of destination; and the act of July 25th, 1866, authorizing the construction of certain bridges over the Mississippi River, and among others a bridge connecting Dubuque with Dunleith, in the State of Illinois, and providing that the bridges, when constructed, should be free for the crossing of all trains of railroads terminating on either side of the river, for reasonable compensation, were designed to remove trammels upon transportation between different States, interposed by State enactments or by existing laws of Congress, and were not intended to interfere with private contracts and annul such as had been made on the basis of existing legislation and existing means of interstate communication.

2. Contracts valid when made, continue valid, and capable of enforcement, so long as peace lasts between the governments of the contracting parties, notwithstanding a change in the conditions of business which originally led to their creation.

---

* Page 204.

3. The power to regulate commerce among the several States was vested in Congress in order to secure equality and freedom in commercial intercourse against discriminating State legislation; it was not intended that the power should be exercised so as to interfere with private contracts not designed at the time they were made to create impediments to such intercourse.

4. Accordingly, a contract between a railroad company and an elevator company, that the latter company, in consideration of erecting and using for that purpose an elevator, should have for a prescribed term the handling, at a stipulated price, of all grain brought by the railroad company in its cars to the city of Dubuque, on the Mississippi River, to be transmitted to a place beyond, did not cease to be valid and binding upon the parties because afterwards, by the construction of a railroad bridge across the Mississippi at Dubuque it became unnecessary for the railroad company or its lessee, and a useless expense to it, to have the grain brought by it to Dubuque handled at that place. The enforcement of the contract after the construction of the bridge was not an interference with the power of Congress to regulate commerce between the States.

Error to the Supreme Court of the State of Iowa; the case being thus:

On the 22d of August, 1860, the Dubuque and Sioux City Railroad Company and the Dubuque Elevator Company, corporations, created both by the laws of Iowa, entered into a contract by which the elevator company was to construct an elevator for receiving, storing, handling, and delivering grain brought by the cars of the railroad company to Dubuque City. On the 2d of January, 1861, a supplemental agreement relating to the same subject was entered into between the same companies; the two contracts, as the court held, being, to be considered together as forming one.

By that contract the elevator company, on its part, stipulated, among other things, to erect on land leased from the railroad company, situated at Dubuque, in the State of Iowa, a building suitable for receiving, storing, delivering, and handling all grain that should be received by the cars of the railroad company, not otherwise consigned, and to make such additions to the building from time to time as the business of the company might require; to receive and discharge at Dubuque for the company all *through grain* — by which was meant all grain transmitted, by the terms of shipment,

through that place to some point beyond—at one cent a bushel, and make no charge for storage unless the grain was in store more than ten days, and then only at certain specified rates; and, at the end of fifteen years, the term of the lease, to renew the contract for another fifteen years, or, at the option of the railroad company, accept payment for its buildings, machinery, and other property used in conducting its business.

And the railroad company, on its part, stipulated that it would not erect a similar building for receiving, storing, delivering, and handling grain at Dubuque, or lease to any others the right to erect any such building; that the elevator company should have the handling at Dubuque of all through grain, and be paid one cent a bushel for receiving and discharging the same, and the compensation designated for storage when it exceeded ten days.

The elevator company erected the buildings required, sufficient and suitable for the purposes intended, and had always been ready to carry out its stipulations.

On the 13th of September, 1867, the Dubuque and Sioux City Railroad Company leased its road and other property to the Illinois Central Railroad Company. In this lease the Illinois company expressly assumed the contract mentioned, made with the elevator company, and soon afterwards entered into possession of the leased property, and commenced transferring grain from Dubuque across the Mississippi River, which had been brought to that point in the cars of the Dubuque and Sioux City Railroad Company. But it did not regard the stipulations of the contract with the elevator company, or only partially performed them; grain was shipped through Dubuque without being delivered to or handled by that company, and without payment of the charges which it claimed as entitled to under the contract; and the present suit was brought in a District Court of the State of Iowa by one Richmond, who had succeeded to the rights of the elevator company, to enforce the contract.

The defence was that the contract as now sued on was repugnant to what is called " the commercial power of Con-

gress" (the power given to Congress by the Constitution "to regulate commerce among the several States"), as that power had been exercised in two several acts now to be spoken of: one was "An act to facilitate commercial, postal, and military communication among the several States,"* passed June 15th, 1866, the preamble and part of the first section of which were as follows:

"Whereas, the Constitution of the United States confers on Congress, in express terms, the power to regulate commerce among the several States, to establish post-roads, and to raise and support armies; therefore,

"Be it enacted, That every railroad company in the United States, whose road is operated by steam, its successors and assigns, be, and is hereby, authorized to carry upon and over its road, boats, bridges, and ferries, all passengers, troops, government supplies, mails, freight, and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States, so as to form continuous lines for the transportation of the same to the place of destination."

The other was "An act to authorize the construction of certain bridges, and to establish them as post-roads," passed July 25th, 1866,† and authorizing any person or corporation, with the consent of the two States named, to construct and maintain a bridge across the Mississippi, between Dubuque in Iowa and Dunleith in Illinois; "and to lay on and over said bridge railway tracks *for the more perfect connection of any railroads that are or shall be constructed to the said river at or opposite said point, and when constructed all trains of all roads terminating at said river at or opposite said point, shall be allowed to cross said bridge for reasonable compensation* to be made to the owners of said bridge," under certain conditions which the act provided.

The District Court denied the force of the defence set up as abovementioned, and gave a judgment in favor of the elevator company for a part of the money claimed.

---

\* 14 Stat. at Large, 66.                    † Ib. 244.

The case coming for review to the Supreme Court, that court also denied the validity of the defence, and adjudged that the Constitution and the acts of Congress relied on by the railroad company did not in any manner affect the validity or force and effect of either of the contracts.

To review this judgment the defendants sued out a writ of error from this court under the twenty-fifth section of the Judiciary Act, and contended here, as in the court below, that the contract sued on was repugnant to the commercial power of Congress as exercised in the passage of the two acts referred to, and in contravention of the public policy established thereby.

*Mr. J. F. Wilson, for the plaintiff in error; Messrs. Platt Smith and J. M. Griffith, contra.*

Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:

There is no question about the power of the Dubuque and Sioux City Railroad Company to make the contract in controversy with the elevator company; and if there were any, it would not be one within our province, upon the present appeal, to decide. The railroad company was obliged to discharge the grain it carried in its cars at the terminus of its road; and in securing the use of an elevator it provided the least expensive and the most expeditious mode for that purpose. The period for which the contract should be made, like other contracts for service, was one which rested in the discretion of the companies. No rule of law limited the period of its continuance. The occurrence of subsequent events, rendering it of more or less value to either of the parties, could not affect its validity or justify any violation of its provisions.

The plaintiffs in error contend—we quote their own language—"that the contract sued on in this action is repugnant to the commercial power of Congress, as exercised in the passage of the acts of June 15th, 1866, and July 25th, 1866, and in contravention of the public policy established

thereby." The act of Congress of June 15th, 1866, authorized every railroad company in the United States, whose road was operated by steam, and its successors and assigns, to carry upon and over its road, boats, bridges, and ferries, all passengers, troops, government supplies, mails, freight, and property, on their way from one State to another State, and to receive compensation therefor, and to connect with roads of other States so far as to form continuous lines for the transportation of the same to their place of destination. The act of July 25th, 1866, authorized the construction of certain bridges over the Mississippi River, and among others a bridge connecting Dubuque with Dunleith, in the State of Illinois, and provided that the bridges, when constructed, should be free for the crossing of all trains of railroads terminating on either side of the river, for reasonable compensation.

These acts were passed under the power vested in Congress to regulate commerce among the several States, and were designed to remove trammels upon transportation between different States, which had previously existed, and to prevent the creation of such trammels in future, and to facilitate railway transportation by authorizing the construction of bridges over the navigable waters of the Mississippi. But they were intended to reach trammels interposed by State enactments or by existing laws of Congress. They were not intended, even if it were competent for Congress to authorize any such proceeding, to invade the domain of private contracts, and annul all such as had been made on the basis of existing legislation and existing means of interstate communication. Contracts valid when made, continue valid, and capable of enforcement, so long, at least, as peace lasts between the governments of the contracting parties, notwithstanding a change in the conditions of business which originally led to their creation.

The power to regulate commerce among the several States was vested in Congress in order to secure equality and freedom in commercial intercourse against discriminating State legislation; it was never intended that the power should be

exercised so as to interfere with private contracts not designed at the time they were made to create impediments to such intercourse.

The argument of the plaintiffs in error would lead to the abrogation of all contracts of the Iowa Railroad Company which might prove from subsequent events to be more onerous than contracts made after such events had happened. A contract, for example, for the supply of coal for the engines of the company, made upon terms which were at the time reasonable, might be felt to be very hard and oppressive if, before its termination, the discovery of new fields of coal in the vicinity of the road should reduce the market price of the article one-half. To assert that the enforcement of a contract of this kind would be repugnant to the commercial power of Congress, because the expenses of transportation would be less if the contract were annulled, would not be more extraordinary than the position assumed by the appellant in the present case, and would be equally entitled to consideration.

When counsel speaks of the public policy established by the acts of Congress mentioned, he must mean nothing more than that the acts were intended to facilitate commercial intercourse among the States. Undoubtedly such was the case, and it is of great public interest that such intercourse should be free and untrammelled. But if comparisons may be made with respect to a subject of this nature, we should say that the observance of good faith between parties, and the upholding of private contracts, and enforcing their obligations, are matters of higher moment and importance to the public welfare, and far more reaching in their consequences.

DECREE AFFIRMED.