GRAND TRUNK W. RY. CO. et al..v. CHICAGO & E. I. R. CO.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1905.)

No. 1,111.

**1. EQUITY—JURISDICTION—PREVENTING MULTIPLICITY OF SUITS.**

A contract by a lessee railroad company to run its trains over the tracks and use terminal facilities of the lessor during the term of a lease for 999 years and to pay rental on a wheelage basis, if clearly established and valid, is specifically enforceable in equity on the ground of the avoidance of a multiplicity of suits, which would be vexatious and expensive and in which the relief obtainable would be inadequate.

**2. RAILROADS—LEASE OF TERMINAL FACILITIES—ENFORCEMENT BY CO-TENANTS.**

A series of leases and agreements in renewal between a terminal railroad company and its constituent companies as tenants, providing for the use by them of the tracks and facilities of the lessor and the payment of rentals on a wheelage basis, construed, and *held* not to contain any covenant on the part of one tenant to use such facilities which could be enforced by the others in their own right.

**3. SAME—COVENANT TO USE.**

Such contracts also *held* to contain no covenant, express or implied, binding a lessee in favor of the lessor to use the tracks and facilities during the term, but merely to grant the right to such use to the extent desired upon the terms stated.

**4. CONTRACTS—MERGER OF PRIOR AGREEMENTS.**

In the absence of allegation of fraud or mistake, a lease is presumed to express the deliberate contract of the parties, although it differs in terms. from a prior contract, pursuant to which it was executed. In such case the prior agreement is merged, and the rights of the parties are governed by the new contract.

[Ed. Note.—For cases in point, see vol. 95, Cent. Dig. Contracts, §§ 1129, 1130.]

**5. EQUITY—ISSUES—ABSENCE OF NECESSARY PARTIES.**

A defendant cannot be required to litigate questions which directly involve issues with third persons not before the court, and which cannot be adjudicated in their absence.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

The appellants, the Grand Trunk Western Railway Company (styled for brevity the "Grand Trunk Company"), Chicago & Erie Railroad Company (styled for brevity the "Erie Company"), Chicago, Indianapolis & Louisville Railway Company (styled for brevity the "Monon Company"), and the Wabash Railroad Company (styled for brevity the "Wabash Company"), brought suit against the Chicago & Eastern Illinois Railroad Company, the appellee (styled for brevity the "Eastern Illinois Company"), to restrain the latter from diverting its passenger business at Chicago from the Dearborn Street Station of the Chicago & Western Indiana Railroad Company (styled for brevity the "Western Indiana Company") to the terminals at La Salle Street Station of the Chicago, Rock Island & Pacific Railway Company. Prior to May, 1879, the Eastern Illinois Company owned and operated a line of railway from Danville northward to Dolton, Ill., then 13 miles south of the city limits of the city of Chicago, reaching the city over the lines of the Cincinnati, Pittsburg & St. Louis Railroad Company from Dolton to the terminus of the latter company on the West Side of the city. In May, 1879, the Eastern Illinois Company, desiring terminal facilities on the South Side of the city, entered into contract with one J. B. Brown, dated May 6, 1879, which provided for the organization by Brown of the Western Indiana Company for the purpose of securing to the Eastern Illinois Company "an independent and perpetual railway entrance into the city of Chicago." The

company so to be created was to construct a line of railway connecting at Dolton with the northern terminus of the railway of the Eastern Illinois Company, and to extend into the city of Chicago, the passenger terminus to be on the South Side, and as far north as Sixteenth street, which line, when constructed, the Eastern Illinois by express covenants agreed to enter into possession of and use, maintain, and operate for the full term of 999 years. By this contract it was contemplated that the Eastern Illinois would assume all obligations of the Western Indiana Company; that it would conduct and develop the local passenger and freight business of the road to its fullest extent, and would pay $3,000 per annum on account of taxes on the main line of the road during the full term. The Western Indiana was to have the right to admit other companies to the use of the property, subject, however, to the right granted to the Eastern Illinois Company to conduct the entire local business, the subsequent tenants to have the right of passage for their through trains only. After the admission of other tenants, the expenses incurred by the Eastern Illinois Company in maintaining and operating the road were to be shared by the subsequent tenants upon a wheelage basis. The Eastern Illinois Company agreed to guaranty the payment of $800,000 of bonds to be issued by the Western Indiana Company, and to provide by proper lease for the payment of the interest and, by means of a sinking fund, of the principal of such bonds at maturity; and after the payment of such bonds the Eastern Illinois Company should be absolved from the payment of rentals, except for the repair, renewal, maintenance, and payment of taxes and assessments. The contract further provided that, upon the coming into existence of the proposed new corporation, the Western Indiana Company should enter into proper written agreement with the Eastern Illinois Company covering all the points specified in the contract. In July, 1879, the Western Indiana Company was organized, Brown becoming its president, the contract above stated being assigned to it by Brown, and the company agreed to keep and perform the covenants of Brown. This company was incorporated to build a terminal system, and was authorized to construct a line of railway from the Indiana state line and from Dolton into the city of Chicago, and there to provide terminal facilities for as many railroads as might become its lessees.

On October 24, 1879, the Western Indiana and the Eastern Illinois Companies entered into an agreement denominated in the record as the "original lease," in which the agreement is spoken of as a lease, and the parties as lessor and lessee, respectively. The document is voluminous, and the recitals and covenants are many. It recites that proper terminal facilities in the city of Chicago are necessary for the proper management of the business of the Eastern Illinois Company, that those in course of construction by the Western Indiana Company are adequate for the use contemplated; and then the Western Indiana Company: "In consideration of the premises and of the rents reserved, and the covenants and agreements on the part of the party of the second part [the Eastern Illinois Company], to be by the said party of the second part kept and performed as hereinafter mentioned, has granted, demised, and leased, and by these presents does grant, demise and lease unto the said party of the second part the right and privilege of using and running locomotives, cars, and other rolling stock of the said party of the second part over and upon the main track or tracks of the railroad of the party of the first part [meaning only the direct main track or tracks between Dolton and the terminus in Chicago] from its junction with the road of the party of the second part, at or near Dolton, in the county of Cook, state of Illinois, to the passenger depot of the said party of the first part in the city of Chicago, when constructed, and to the freight buildings, engine houses, repair shops, switchyards, and dock property, the use of which is vested in the party of the second part, and which are more particularly hereinafter described, as well as the right to use all switches and turnouts appertaining to the said track or tracks for all purposes of the traffic of the said party of the second part; also the right and privilege of using for the purposes of such traffic the passenger depot and its appendages of the said party of the first part, in the city of Chicago, when constructed; and also the exclusive right and privilege of using for the purpose of such

traffic, the freight buildings, engine houses, repair shops, switchyard, and dock property," a particular description of which follows, "and together with all the franchises, rights, and privileges of the said party of the first part thereto belonging, or in any wise appertaining, only to the extent, however, that may be necessary and sufficient to enable the party of the second part to use and enjoy the rights and privileges hereby intended to be granted, demised, and leased: Provided always, and it is hereby expressly understood and agreed, that the right and privilege of using the track, the passenger depot, and the other property and premises * * * hereby granted, demised, and leased * * * shall be exercised in common with the Western Indiana Company and such other company or companies as may from time to time obtain the grant of similar rights, privileges, and use of the same." The habendum clause is for the use of the freight buildings, engine houses, repair shops, switchyard, and dock property exclusively, and the use of the track, passenger depot, and other premises in common with the Western Indiana and such other companies as may thereafter obtain leases therefor, and right to use the same for the full term of 999 years from the 30th day of October, 1879; the Eastern Illinois Company yielding and paying yearly, and every year during the said term, the yearly rental thereinafter specified, and keeping and performing the covenants. Then follow certain express covenants upon the part of the Eastern Illinois Company as follows: (1) To pay $5 annually on January 1st during the entire time mentioned. (2) To pay all taxes, assessments, liens and water rents, whether state, municipal, or other, lawfully imposed "upon this lease and upon the freight buildings, engine houses, repair shops, switchyard, dock and other property," the exclusive use of which is vested in the Eastern Illinois Company, and upon the franchises, earnings, traffic, and business of the premises demised, or in any way derived therefrom. (3) To pay yearly and in every year during the term the sum of $3,000 on account of taxes and assessments imposed upon the main line of the road from Dolton into the city of Chicago, and, in the event of extension of the road beyond Fourteenth street, to pay such additional sum as would be its proper and just share of the additional taxes and assessments, according to the proportion of its wheelage per mile over the main line. (4) To pay by way of further rental the sum of $4,000 monthly, until the sum of $800,000 shall have been paid, such payments to commence upon possession being taken by the Eastern Illinois Company; but the monthly rental shall be diminished pro tanto as the capitalized rental, $800,000, is reduced by operation of the sinking fund thereinafter provided. (5) The Eastern Illinois Company to pay upon the first of each month during the term commencing July 1, 1884, such a sum of money as, together with the monthly rental of $4,000 provided for, will, within 35 years from January 1, 1885, pay 6 per cent. per annum upon the capitalized rental of $800,000 before it shall be reduced by the operation of the sinking fund on the 1st day of January, 1885, and after that time 6 per cent. per annum upon the amount of the capitalized rental as reduced; and also so much by way of sinking fund as will pay off and extinguish the principal of said capitalized rental of $800,000 within 35 years from January 1, 1885.

The instrument recites that the Western Indiana Company had executed a mortgage dated July 1, 1879, to Anthony J. Thomas, as trustee, to secure the payment of bonds to the amount of $1,600,000, that the Eastern Illinois Company had guarantied the payment of series A of said bonds, amounting to $800,000; and it was understood that the rental of $4,000 per month should be used and applied for the payment of interest upon the bonds so guarantied, and the sinking fund should be applied to the payment of such bonds; and that the rental and the sinking fund should be paid by the Eastern Illinois Company to the trustee in the mortgage, and should be applied to the payment of the interest upon the bonds, and to the extinguishment and cancellation of the bonds so guarantied. Like provisions are contained in the instrument for further payments in case of the construction of the road beyond Fourteenth street to Van Buren street, with respect to which the Eastern Illinois Company should have the same rights and use as provided with reference to the other part of the line. It recites that the Western Indiana Company contemplated making a new mortgage for $4,000,000, and that the prior mort-

gage and bonds to Thomas should be satisfied and canceled, and bonds to the amount of $800,000 under the proposed new mortgage should be substituted, and applies the stipulations of the agreement with like force and effect to the new mortgage. There is a further provision that, as the Eastern Illinois Company should during the term conduct the entire local business between Dolton and the city of Chicago, and other companies, to whom leases may be made, and with whom operating and traffic arrangements may be entered into by the Western Indiana Company, should have passage over the line for through trains only, it was agreed that the Eastern Illinois Company should be entitled to conduct, and will conduct, the entire local business between Dolton and the terminus in Chicago in such manner that the business shall be fully developed and preserved, and that the public shall be afforded all practical facilities and conveniences, and that the Eastern Illinois Company shall and will, at its own expense, "exercise the rights and privileges hereby granted as fully as the party of the first part, as the owner thereof or otherwise, is now, or may be by law required to do, and at the same time in such manner as not to interfere with or obstruct the full and free use of the main track or tracks, passenger depot, sidings, turnouts, and the other property which may from time to time be used by it in common with the party of the first part and other companies, or the traffic and business of the party of the first part and said other companies over the same, and shall and will keep up, maintain, and operate the stations, freight buildings, engine houses, repair shops, switchyards, dock and other property used by it exclusively in thorough repair, working order and condition, using the best and most suitable materials for renewals of the same, as renewals shall from time to time become necessary, so as to be suitable at all times for the transaction of the traffic and business aforesaid"; that the Eastern Illinois Company should perform all the duties by the laws of the state or ordinances of towns and cities which should be now or hereafter required in regard to the rights, privileges, and premises granted, and should pay to the Western Indiana Company its proportion of the expenses incurred or paid by it in maintaining and keeping in thorough repair and working condition the main track or tracks, passenger depot, terminal facilities, and other property, the common use of which has by agreement been reserved, and in supervising the use and managing the same, and other proper joint expenses and charges arising from the tracks, depot, terminal facilities, and other property used in common, and the traffic over the same, such proportion to be determined by the wheelage of the Eastern Illinois Company and of the other companies over the part of the line so used in common. It was mutually covenanted that the Western Indiana Company should have the general control, management, and supervision of the main line, passenger depot, grounds, and other property which may be used by the Eastern Illinois Company in conjunction with others, and the sole control and direction of the management, use, location, improvement, and repair of the same, the appointment and supervision of all officers, agents, and employés necessary for such purpose, and to establish and enforce such reasonable rules and regulations as may be necessary; and the Eastern Illinois Company should have the exclusive right to manage, maintain, and keep in order, at its own cost and expense, such portion of the main track as it may use exclusively of others, and, so soon as any such portion of the track should come into the use of another company in conjunction with the Eastern Illinois Company, that portion of the track should immediately fall into the management of and be maintained and kept in order by the Western Indiana Company. The Eastern Illinois Company also agreed to keep the buildings upon the premises occupied by it exclusively fully insured against loss by fire, loss, if any, payable to the Western Indiana Company, and to pay a proportional part of the premiums for insurance upon the property used in common, said proportion to be determined by the wheelage of each company using the same; the proceeds of such insurance in case of loss to be applied to the repair, rebuilding, and restoration of the property destroyed. There are the usual covenants to be found in a lease with respect to the surrender of the property demised at the expiration of the term, and the usual provisions for default in respect of the covenants of the lease.

On October 25, 1879, the Western Indiana Company executed to the Wabash Company an agreement or lease of a portion of its main line from its junction with the Western Indiana, near Seventy-Fifth street.   On July 1, 1880, it executed to the Grand Trunk Road a similar agreement or lease of that portion of its line north of the junction with the Grand Trunk, near Forty-Ninth street.   On November 1, 1880, the Western Indiana Company executed a similar agreement or lease with the Erie Company from the junction of its road with the line of that company, near Hammond, Ind.   On December 1, 1881, it executed to the Monon Company a similar agreement or lease of a portion of its main line from the state line.   All these agreements or leases covered the line of railway from the point of junction to the passenger station, when constructed.   The rights granted to the Wabash Company were made subject to the exclusive right of the Eastern Illinois Company to conduct local business.   The Wabash Company was to pay its wheelage proportion of the maintenance and operation expenses of the Western Indiana Company, and its wheelage proportion of the taxes upon the common property.   The provisions as to local business and payment of taxes were the only provisions in which the lease differed from the "original lease" with Eastern Illinois. The leases to the other roads were similar to that to the Wabash Company. The amount of rental differed to some extent in each, and the exclusive freight facilities also differed, but in all other respects the leases were in exactly the same terms as the lease to the Wabash Company.   In none of these leases or agreements, except that of the Eastern Illinois Company, is any obligation assumed to conduct local business between Dearborn Station and Dolton.

The Western Indiana Railway was completed to Twenty-Second street in the spring of 1880, and in April of that year the Eastern Illinois entered into possession under its agreement.   Later in that year the road was extended to Fourteenth street, and in 1882 to Dearborn Station at Polk street.   The freight terminals, the use of which was granted to the Eastern Illinois, were located between Thirty-First and Thirty-Fifth streets, and between Fourteenth and Fifteenth streets; the former being the outer yard and roundhouse, and the latter, the freight depot and team tracks.   Commencing in April, 1880, and for several years thereafter, all freight trains of the Eastern Illinois Company used the Western Indiana tracks from Dolton to the yards at Thirty-First street or Fourteenth street, and all passenger trains ran to the northern passenger terminus, which was moved successively from Twenty-Second to Fourteenth street, and in 1882 to Dearborn Station at Polk street.   On December 1, 1880, a second and supplemental agreement or lease was executed between the Western Indiana and the Eastern Illinois Companies, granting to the latter the use of additional exclusive property and of additional common property to a station to be constructed to the south of the south line of Twelfth street.   It recites that it is the intention that the additional rights and franchises granted should be used and held in the same manner, affected by the same recitals, subject to the rights, liabilities, and conditions as to each party as are contained in the original lease, except as to the commencement, amount of rentals and payments, and the basis of calculating taxes on main passenger tracks.   As to the latter, the Eastern Illinois Company, in the manner provided in the original lease, agreed to pay its share upon the proposed extension of line in the proportion that its passenger wheelage over that part of the main line used jointly with other companies should bear to the total passenger wheelage over the same.

In 1882 additional funds were found to be necessary to complete the railroad.   The original mortgage of $1,600,000 was canceled.   A new mortgage, called the "first mortgage," was executed, amounting to $4,000,000, and still another mortgage, called the "general mortgage," dated January 1, 1882, was issued, amounting to $10,000,000; and it was contemplated to issue a further mortgage to secure bonds to be issued to retire all outstanding bonds.   New several leases were executed between the Western Indiana Company and its several lessees, each of which is dated November 1, 1882.   The one with the Eastern Illinois Company recites the two prior leases, the proposed construction of a larger and more convenient passenger station, and the inability of the Western Indiana to furnish station accommodations for passenger busi-

ness, as required by the terms of the original lease, unless it should be paid additional rental. It then grants, in addition to the premises and uses already granted, the right and privilege of using the passenger station, railway tracks, and appendages thereafter to be constructed, etc. The covenants of the lessor and lessee in the original leases are repeated in this third lease, changed only as to the amounts and times of the rental and sinking fund payments to secure the additional issue of bonds. The covenants in the original lease to pay the lessor the lessee's wheelage proportion of operating expenses is amplified with respect to what shall be considered operating expense; but the expenses are to be paid in proportion to the wheelage, subject to the $3,000 tax commutation agreement in the original lease. The fourteenth paragraph in each of the leases to the five tenants contained a new provision as follows: "It is further agreed between the lessor and lessee that the lessee herein shall have the right at any time to use and enjoy any part of the common lines and property of the lessor as herein defined, not now included in the lease of October 24, 1879, and the supplemental lease of December 1, 1880, or in this lease, for an increase in the rent to be paid by such lessee equal to such proportion of 6 per cent. upon the cost of such lines and property thus newly used as the use by the said lessee bears to the use and enjoyment thereof by all of the lessees using the same. In case the lessor shall be obliged to provide additional facilities by reason of such additional use, the lessee or lessees so availing themselves of the right to such use under this clause shall pay by way of additional rental not less than six per cent. upon the cost of whatever additional facilities the lessor is obliged to provide by reason of such additional use, and any lessee availing itself of this privilege shall also provide and pay such monthly sinking fund payment as shall extinguish the capital of such additional rental within forty-five years from the time such lessee shall begin to make use of such lines or property as provided for in this article: but this provision is subject to the exclusive rights of the Chicago & Eastern Illinois Railroad Company to do the local business over the main line of the lessor as provided by the lease to the Chicago & Eastern Illinois Railroad Company under date of October 24, 1879, and it is also understood and agreed that this does not apply to what is known as the 'Belt Division' of the property of the lessor."

On November 1, 1882, an agreement was made between the Western Indiana of the one part and the five tenant companies of the other part, which recites that the five companies are severally tenants of the Western Indiana Company under lease agreements, and that such five companies have acquired, and own in equal proportions, the entire capital stock of the Western Indiana Company, amounting to $5,000,000, which they have purchased for the purpose of securing control of the railway and property of the Western Indiana Company, in order to prevent its passing into possession of any other railroad companies whose interests may be hostile to the interests of the parties lessees; recites the organization of the Belt Railway Company with a capital stock of $12,000,000, of which $6,100,000 is the property of the five lessee companies in equal proportions of $1,220,000 each, and that the Belt Company had leased from the Western Indiana Company in perpetuity its Belt Railroad and elevator; recites the agreement that the stock of both the Western Indiana and the Belt Companies shall be issued in equal proportions to the five lessees, and shall be nonnegotiable by being stamped that it is held subject to the right of other stockholders to purchase it, and that each of the lessees shall be represented by one person upon the board of directors of each of the companies, and shall be authorized to fill any vacancies that occur. It is therein agreed that the working expenses of the Western Indiana shall be paid by the several lessees monthly in proportion to their wheelage over the main line or such part of the main line and property of the Western Indiana as is not set apart for the exclusive use of either; that, as to the Dearborn passenger station and tracks immediately south, the cost of maintenance shall be divided in proportion to the number of passenger cars and engines entering thereon, but not to affect the Eastern Illinois tax commutation provision in its original lease. It was further agreed that while the Western Indiana should have the general control and management of all the

common property, and the employment and supervision of officers and employés, its acts and doings should be such only as the parties lessees should unanimously approve.

On August 1, 1890, a second main track, between Dolton and Oakdale, the point of junction of the Dolton and State Line branches, was proposed for construction, and thereupon a further agreement was made between the Western Indiana of the first part, the Eastern Illinois Company of the second part, the trustee of the mortgage of the third part, and the lessee appellants of the fourth part, providing for this construction by the Western Indiana; the Eastern Illinois covenanting to make rental and sinking fund payments sufficient to pay the interest and principal of the bonds to be issued to meet the costs of such second main track and its appurtenances. It is expressly stated that the prior leases were to be in no effect altered, and that the effect of the present instrument was to give additional rentals and sinking fund, and to demise additional property, as if they had been included in the former instruments, and the property was to be used together with and as part and parcel of the property, privileges, rights, and franchises demised by the previous leases. The lessee appellants, the parties of the fourth part to the agreement, joined therein to evidence their assent to the making of the improvements and additions provided for by the lease, and to the making of the lease thereof to the Eastern Illinois Company and each of the appellants severally, and for itself agreed that, if it shall exercise its right of user of the track or tracks or property of the Western Indiana Company lying between Oakdale and Dolton, it will pay for the use an increase of rental equal to such proportion of 6 per cent. upon the cost of the line and property so newly used, as it now exists, as the use of such lease bears to the use and enjoyment thereof by all the lessees using the same.

On September 30, 1890, the question having arisen between the Western Indiana and one of the lessee companies as to liability for damage claims arising from injuries at railway crossings by trains of lessee companies, where the Western Indiana Company had neglected to properly protect the crossings by gates or signal men, resolutions were adopted by the lessee companies that in respect of all questions concerning the exclusive liability of either tenant for damages in the use made of the property, by reason of any casualty or of any negligence of commission or omission on the part of the Western Indiana Company, the several leases between the tenants and the Western Indiana Company should be thereafter interpreted and understood as constituting the Western Indiana Company the mere medium or agency through which the several tenants, each for itself, controls, operates, manages, maintains. and repairs the railroad and other property; and that the officers and employés of the Western Indiana Company shall be considered as solely and exclusively the officers and employés of the tenant for the doing of all acts which they may have done, and for the doing of such acts as they have omitted to do, the doing or omission of which have given rise to such damage or claim for damage; and that, as between the Western Indiana and each of the tenants, the tenant company shall be exclusively liable for all damages, and shall be considered as having separately indemnified the Western Indiana Company against all claim for damages resulting from the use by such tenant, as fully as if such tenant were in the sole and exclusive control of the railroad and appurtenances, and without reference to the cause of the casualty or the circumstances under which the claim arose.

On December 1, 1890, another agreement or lease called the fifth lease, in the general form of the earlier leases, was executed between the Western Indiana Company and the Eastern Illinois Company, reciting the prior leases and their provisions, and granting to the Eastern Illinois Company the exclusive right and privilege of using for its traffic certain real property described, being a strip of land and a certain track connecting therewith, in connection with its freight facilities, the property to be used as part and parcel of the property, privileges, and rights demised by the three prior leases.

On November 1, 1891, further enlargements of the main right of way and common property of the Western Indiana Company becoming necessary to

accommodate the increasing traffic of the tenants, the Western Indiana Company entered into a further agreement with the Eastern Illinois Company, granting the right and privilege of using, for the purposes of its traffic and running its locomotives, cars, and other rolling stock thereon, so much of the enlargements, additions, and improvements which the Western Indiana shall make upon its railroad as shall be appurtenant to or parcel of that part of the line of railway which the Eastern Illinois has or shall have the right to use and enjoy under the grants recited. The lease provides for additional rentals to cover one-fifth of the proposed issue of 2,000,000 of bonds. All the covenants of the lessee are like the covenants in the original lease, and there is a proviso that the instrument shall not affect or abridge any of the corporate franchises or powers of the Western Indiana Company to use and operate the railway in its own behalf, or to lease it or make tracks for use by other railway companies, and to furnish facilities similar to those granted to the Eastern Illinois Company. Similar leases to each of the other four tenants, the appellees, are recited in the lease stated.

An agreement bearing the same date was made between the Western Indiana Company and the five lessee companies, providing in substance that while, under the five leases of that date entered into, each tenant was required to pay additional rentals sufficient to meet the interest, and by way of sinking fund the principal of the $2,000,000 mortgage, as interest on that sum, the rental should be equalized as between the five tenants on the basis of their respective wheelage uses of the portions of the common property upon which the $2,000,000 was to be expended. It also recites that the five lessees are the beneficial owners of equal parts of the capital stock of the Western Indiana Company; that each of them holds, under leases made by that company, the right to use for the purposes of its traffic, in common with the other lessees, and with the Western Indiana Company and other railroad companies to whom similar rights of user have been and may be granted, certain portions of the railway and property of the Western Indiana Company.

On July 1, 1902, it having become necessary for the Western Indiana Company to elevate its tracks as required by the city of Chicago, and to raise a large amount of money for that purpose, the Western Indiana Company entered into an agreement with its five tenants, dated July 1, 1902, which recites that each of the tenant companies holds in severalty certain portions of the property of the Western Indiana Company, and also the right to use for the purposes of its traffic, in common with the Western Indiana Company, and with other railroad companies to which the Western Indiana Company has granted certain portions of the railroad and property of that company, which rights and properties are reserved to said lessees by the several leases specified and hereinbefore stated. The agreement provided for a new issue of bonds, under a consolidated mortgage, to an amount not exceeding $50,000,000, which should take up outstanding bonds and repay to the several tenants their respective payments into the sinking fund under prior mortgages for the cancellation of the principal of prior bonds, and provide funds for the improvements contemplated and such as should become necessary. The agreement confirmed the existing rights of user held by the respective tenants, provided for the equalization of such rights by two new provisions—the one canceling the Eastern Illinois' exclusive right to the local freight and passenger traffic on the Western Indiana line between Dolton and Chicago; the other, canceling the provision of the inter-tenant agreement of November 1, 1891, which redivided certain rentals for interest on the basis of the wheelage use of the portions of the line improved by expenditure of the $2,000,000 thereby provided. It also canceled the Eastern Illinois Company's special privilege and exemption under its $3,000 commutation clause in its original lease, and provided that thereafter each of the lessees should have equal right to use of the common property of the lessor upon like terms and conditions. It provided that the Western Indiana Company, the lessor, should pay the Eastern Illinois Company $551,246.50 as compensation for the release of the special tax commutation privilege, and for the release of its exclusive right to conduct the entire local business between Dolton and Chicago, and should pay the Grand Trunk Company, as compensation for its release of its pecuniary benefits under the agreement of

November 1, 1891, $20,665.35 per annum from that date until it shall use for its traffic the railroad of the lessor south of Forty-Ninth street. It granted, demised, and leased unto each of the lessees, in addition to the rights, privileges, property, and franchises already granted and leased to said lessees, respectively, the equal right and privilege of using, for the purpose of its traffic, all and singular the railroad, railway tracks, stations, and appendages, and terminal facilities of the lessor of which a common use had been granted under any of the leases, meaning thereby the direct main track or tracks between the two south termini—the one at the state line near Hammond, and the other at Dolton—and the northern terminus at the city of Chicago at the intersection of Polk and Dearborn streets, comprising what is known as the "common property" of the lessor, but with the limitation that the rights and privileges granted should be exercised in common with the lessor and with each of the other lessees, and with such other company or companies as have obtained or may hereafter obtain a grant or lease of similar or other rights, and reserved to the lessor the right to use and operate the railroad on its own behalf, and to grant terminal facilities, similar to those granted, to one or more companies. The grant was for the full term of 999 years from the 1st of July, 1902, and the rental reserved was: First, each lessee to pay $5 per annum rental during such term; second, to pay monthly to the trustee of the mortgage during the first 50 years of the term, and by way of additional rental to that reserved by the existing leases, a sum of money equal to one-half of one-twelfth of the annual interest of all outstanding bonds issued under the consolidated mortgage; third, each lessee to pay for the exclusive use of such portions of the property held by such lessee in severalty, in addition to the rentals reserved by the then existing leases, a sum of money equal to one-twelfth of the annual interest on bonds issued from time to time under the consolidated mortgage and used for certain purposes specified, to wit, improvements and enlargements, refunding bonds, and the repayment of the sinking fund; fourth, at the end of 50 years, and at the maturity of the bonds, each lessee should pay one-fifth of the principal of the bonds for the purpose specified. The thirty-second paragraph of the lease is as follows: "That whenever any lessee, party of the second part, shall surrender for cancellation to the trustee under said consolidated mortgage an amount of bonds secured thereby equal at their par value to the total original cost aforesaid of such lessee's exclusive property, such lessee shall be entitled to receive a quitclaim deed of its said exclusive property from the Western Indiana Company, and a release thereof from the lien of said consolidated mortgage, but such deed shall expressly provide, and said conveyance shall be upon the condition, that said property shall not be leased, sold, aliened, nor conveyed by such lessee, until it shall have given written notice to the lessor of its purpose to lease, sell, convey, or alien the same; and that thereupon the lessor and, after it, each of the other said lessees, shall have the option of buying said exclusive property at its original cost and four per cent. interest from the date of such deed from the lessor to such lessee, or of leasing the same at an annual rental of not to exceed four per cent. on such original cost plus four per cent. interest thereon from the date of such deed; and that if the lessor shall fail to exercise such option within sixty (60) days after the receipt of such written notice, and none of the said lessees shall exercise its option within twenty days after the expiration of said sixty days, such lessee shall thereupon have the right to lease, sell, convey, or alien the said property free and clear from all liens or claims of any nature on the part of the Western Indiana Company." The thirty-third paragraph of the lease is as follows: "That after the date hereof the lessor shall exclusively manage, operate, and maintain every portion of the common property; and the entire cost of the management, operation, maintenance, repair, and renewal of, and of all taxes, liens, water rents, and assessments on, said railroad, buildings, and facilities, the common use of which is reserved to the parties hereto, and the entire cost of the management, operation, maintenance, repair, and renewal of, and all taxes, liens, water rents, and assessments on, all enlargements and improvements thereof, and additions thereto, and on, and to any other railroad hereafter acquired by the lessor for the

common use of the parties hereto, shall be borne by said lessees in the proportion of their several wheelage uses of the various portions of said railroad to the total wheelage use thereof: and, for the purpose of distributing such cost, the lessor shall divide, by lines across and at right angles with its right of way, its said railroad and property, including all appurtenances, into such sections as shall be necessary in order to equally distribute such cost of the management, operation, maintenance, repair, and renewal of, and all taxes, liens, water rents, and assessments on, said several sections among the parties of the second part in proportion to their respective wheelage uses of such sections; and it may, from time to time, change such sectional divisions the better to subserve the purpose and intent aforesaid." The fourteenth paragraph states that the lessees have severally covenanted and agreed, each for itself, to and with the lessor, and to and with the trustee—the covenants of the leases being several and not joint—as stated in the document.

Under date of July 1, 1903, the Western Indiana Company granted to the Eastern Illinois Company the exclusive use of certain acquired additional freight facilities. upon the covenant of the latter company to pay the interest and principal of the bonds under the consolidated mortgage for the purchase of the premises. The former leases are referred to, and the covenants in the former leases are extended to the property granted, the demised property to be used as part and parcel of the property theretofore demised. This property had not been owned by the Western Indiana Company prior to the date of the lease. The title to it was held by a trustee for the benefit of the Eastern Illinois Company, and it had been used by the latter company for many years as a part of its exclusive freight yards. The change in the title is said to have been made to enable the Eastern Illinois Company to convert its ownership held by, the trustee into a lease-hold, so that it might receive the cash value thereof, being the consideration paid by the Western Indiana Company, as recited in the lease. In 1903 the Chicago, Rock Island & Pacific Railway Company, which is the owner of an undivided half of the La Salle Street Station, obtained control of the Eastern Illinois Company through the ownership of the stock of another company which had before that time become the owner of the stock of the Eastern Illinois, or of so much of the stock as to give it control. The Eastern Illinois Company then asserted its right to divert certain of its passenger trains from Dearborn Street Station to the La Salle Street Station, and thereby relieve itself pro tanto from the expenses of management, supervision, operation, and maintenance of the Dearborn Street Station and the tracks and facilities appurtenant thereto. The appellants, the other lessee companies, thereupon filed this bill in equity to enjoin the appellee, the Eastern Illinois Company, from the threatened breach of its obligation to use Dearborn Street Station for its passenger traffic at Chicago, alleging that by such diversion the appellants would be required to pay in proportion the working expenses of the Dearborn Street Station theretofore borne by the Eastern Illinois Company, which the covenant of the latter company required it to continue to bear to the extent of its passenger traffic at Chicago, and would deprive the appellants of the benefit theretofore derived from the passenger wheelage of the Eastern Illinois Company between Seventy-Ninth street and Dearborn Station, and the benefits to each of them from the receipt and delivery by the Eastern Illinois Company of all its Chicago passengers at Dearborn Station. The appellee claimed that its agreement amounted only to a trackage agreement, and vested in it no estate, but that it acquired under the agreements and leases the right to use the terminal facilities or not, as it should from time to time see fit, and that it has violated no obligation assumed by it under the leases and agreements stated, and it was also claimed that the agreements, if they should be construed to contain covenants to use, were against public policy, and that the appellants, if any right of theirs had been infringed, had adequate remedy at law; that the proposed diversion of the passenger business to the La Salle Street Station was owing to the failure of the Western Indiana Company to furnish adequate passenger facilities; that the Western Indiana Company is an indispensable party to the suit, and that no decree should be entered without its presence; and that the appellants here have no interest in the respective contracts or leases between

the Western Indiana Company and the Eastern Illinois Company, or in the enforcement thereof.

The court below, upon hearing, dismissed the bill for want of equity, and the cause is brought here for review.

G. W. Kretzinger and Edgar A. Bancroft, for appellants.

William H. Lyford, for appellee.

Before JENKINS and BAKER, Circuit Judges, and KOHLSAAT, District Judge.

JENKINS, Circuit Judge (after stating the facts). The prayer of the bill seeks the specific performance by the Eastern Illinois Company of certain supposed covenants—express or implied—contained in the agreements or leases between that company and the Western Indiana Company, and to restrain the Eastern Illinois Company from diverting its freight and passenger business, or any part of it, from the railway and the Dearborn Station of the Western Indiana Company, and from using the terminal facilities of any other company for its traffic at Chicago.

The questions arising upon this record are these: First, whether the appellants have an adequate remedy at law; second, whether the agreements contain any covenant, express or implied, on the part of the Eastern Illinois Company to the appellants, enabling them to maintain this suit; third, whether the Eastern Illinois Company is obligated by any covenant, express or implied, in the agreements or leases with the Western Indiana Company to use the Dearborn Station and the appurtenant tracks during the entire terms specified, or whether the right of user exists without the obligation to use; fourth, whether such a covenant, if one exists, is contrary to the policy of the state, preventing its enforcement in equity; fifth, whether the Western Indiana Company is a necessary and indispensable party to this suit.

We cannot doubt that if the contract obligation is clear, and no public interests intervene to prevent, equitable jurisdiction should be exercised, since thereby a multiplicity of suits is avoided that would prove vexatious, unsatisfactory, expensive, and the relief obtainable thereby would be inadequate to the situation. Pennsylvaina Railroad Company v. Saint Louis, Alton & Terre Haute Railway Company, 118 U. S. 290, 6 Sup. Ct. 1094, 30 L. Ed. 83; Joy v. Saint Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; Union Pacific Railway Company v. Chicago, Rock Island & Pacific Railway Company, 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265; Western Union Telegraph Company v. Baltimore & Ohio Telegraph Company, 42 N. J. Eq. 311, 11 Atl. 13; Wolverhampton Railway Company v. London Railway Company, 16 L. R. Eq. Cas. 433.

A careful scrutiny of the intertenant agreement of November 1, 1882, the joint resolution and agreement of September 30, 1890, the joint agreement of November 1, 1891, and the joint supplemental lease, so called, of July 1, 1902, discloses no covenant of any kind between the Eastern Illinois Company and the appellants, or either of them. The first, called the inter-tenant agreement, is between the

Western Indiana Company of the one part and the five tenant companies of the other part. It recites the ownership of the entire capital stock of the Western Indiana Company by the five tenant companies. in equal proportions; that it was purchased by them to secure control and to prevent the passing of the Western Indiana Company into hostile interests. It provides with respect to the directorate of that company, restricts the disposition of the stock by any one of the five owners, provides for the general control and management of the property by the Western Indiana Company, and that no other railway company shall be admitted to the use of the property, except by the unanimous consent of the tenant companies; that the working expenses. of the Western Indiana Company should be paid by the several lessees, the proper proportion of each to be determined by the proportion which the engine and car mileage of each bore to the gross engine and car mileage of all over those parts of the main line and property not set apart for the exclusive use of either; and that the cost of maintaining and operating the passenger station, including certain tracks specified, should be divided in proportion to the number of passenger cars and engines entering the same. It may be that, with respect to the expenses specified, the agreement to pay the mileage proportion may be deemed a covenant directly with the other tenant, so that on failure by one to pay to the Western Indiana Company its proper proportion as stipulated, and payment thereof to that company by another tenant company, the latter might have its action to recover the amount paid. This, however, is far from being a covenant to use. It is merely a covenant to pay for use.

The resolution of September 30, 1890, merely provides that in respect to questions concerning the exclusive liability of either tenant for damages by reason of casualties arising from the use of the property, occasioned by the negligence of commission or omission on the part of the Western Indiana Company, the several leases between the tenants and the Western Indiana Company should be interpreted as constituting the latter company the mere medium or agency through which the several tenants, each for itself, operates the railway and property. That interpretation is limited to the one subject of liability for damages for injuries. We do not perceive that it can be given any effect in the consideration of the questions before us.

The agreement of November 1, 1891, recites that the lessees are the beneficial owners in equal parts of the capital stock of the Western Indiana Company, and are lessees of that company, with the right to use, in common with the other named tenants, with the Western Indiana Company, and with such other railway companies to whom similar rights of user have been or may be granted, the "common property" of the railway and the necessity of the enlargement of the facilities; that each of the five tenants should equitably pay in equal proportions, share and share alike, the $2,000,000, the principal of the bonds proposed to be issued necessary for the proposed improvement; and that the interest on the principal sum should be borne by them, respectively, in proportion to the use which they shall severally

make of the several parts of the railway and property upon which the principal sum should be expended. The recital with respect to the payment of the principal of the bonds is manifestly referable to the equal ownership by the five tenants of the stock of the Western Indiana Company. The obligation to pay, if any, is the obligation of stockholders, and is not the covenant of lessees as such. The payment of the interest is referable to the use made by each tenant, and the proportion to be paid by each is dependent upon the wheelage by each. These agreements are far from amounting to a covenant to use.

The "joint supplemental" lease of July 1, 1902, contains no covenants on the part of the tenants to each other. It distinctly provides that the lessees severally covenant, each for itself, to and with the lessor, and to and with the trustee. It provides that the cost of management, operation, maintenance, repair, and renewal, and of taxes, water rents, liens, and assessments, should be equitably distributed among the tenants in proportion to their respective wheelage use.

We are not able to discover in any of these agreements any covenant by the Eastern Illinois Company to the other tenant companies availing to enable the latter in their own right to maintain this bill.

We come then to the question whether there is an existing covenant, express or implied, with the Western Indiana Company, resting upon the Eastern Illinois Company to use the Dearborn Station and the appurtenant facilities during the period mentioned in the leases.

By the contract with Brown, of May 6, 1879, the Eastern Illinois Company by express covenant agreed to enter into possession of and to use and operate the railway and facilities for the period of 999 years. It agreed to assume all the obligations which should devolve upon the Western Indiana Company proposed to be incorporated; to develop the local passenger and freight business of the road to its fullest extent; to pay during the full term $3,000 per annum on account of taxes on the main line of the road. Other tenants, who might be admitted to the use of the property, were to have the right of passage for through trains only. This contract, however, was abrogated by and merged in the "original lease," so called, of October 24, 1879. Brown, the original lessor, had organized the Western Indiana Company, as was contemplated, and became its president, and in the name of the company executed this "original lease." So far, therefore, as the covenants of the two leases are in conflict, those of the former lease are superseded by those of the latter. In the absence of allegation of mistake or fraud, it must be presumed that the "original lease" expresses the deliberate contract of the parties; and, if the provisions of the latter are inconsistent with the provisions of the former, the latter evidences a new agreement, by which, and by which alone, the rights of the parties—as between the two agreements—are to be judged. The Brown lease reserved in the Western Indiana Company no right to operate the road. The "original lease" reserved to the lessor the entire control of the property, and the right to maintain and operate the railway on its own account in common with the right of operation

then granted to the Eastern Illinois Company, and with such rights of operation as might be granted to subsequent lessees; the local business being confined to the Eastern Illinois Company. By the former lease all obligations of the Western Indiana Company were assumed by the Eastern Illinois Company. By the latter lease the Eastern Illinois Company assumed only such obligations as related to the business actually conducted by it. The expense of performance by the Western Indiana Company was to be divided among all the tenants using the road in proportion to their several usage upon a wheelage basis. It may be greatly doubted whether this "original lease," so called, was other than a mere operating agreement as to what is termed the "common property." Union Pacific Railway Company v. Chicago, Rock Island & Pacific Railway Company, 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265.

The several agreements or leases, executed during a period of 25 years, indeed impress one with the conviction that the Eastern Illinois Company during that period thought to make use of the facilities granted during the term mentioned in the lease, but that subsequent events have changed its purpose. The question, however, is not what that company then supposed would be its course, but what has it obligated itself to do? To ascertain the extent of obligation assumed, we must have reference to these instruments. We must ascertain from them what that company has in express language covenanted to do. By the Brown contract it had obligated itself for a period of 999 years to use and operate the railway. That was an express covenant, by which the company was bound. But by the subsequent "original lease," so called, the contract between the parties was changed. It did not therein so obligate itself, but it was therein stipulated that it should have the mere right to use in common; and such right to use without obligation to use is found in every subsequent agreement between it and the Western Indiana Company. This is strong to show, if it be not absolutely convincing, that the Eastern Illinois Company did not contract to assume an obligation to use for that long period of time; that it kept itself free to use these privileges or not, as its interests might dictate, stipulating to pay for such use as it made of them. It is true that with respect to the payment of rental for the "exclusive property," so called, it bound itself for the entire term, and it does not here contest its obligation in that respect. During the period of 25 years there were in all 13 agreements or leases with the Eastern Illinois Company. In each of them there is manifested a careful avoidance of statement of any obligation to use. The like feature is observable in each of the leases to the several appellants. These papers were undoubtedly drafted by experienced counsel. They are voluminous in their terms and conditions, and evidence careful study and skill in the drafting of them. It cannot be possible that throughout these many documents an obligation to use was omitted otherwise than by design. There was the absolute obligation in each of them to pay during the term the prescribed rental with respect to the exclusive property. There is, in respect of the common property, no obligation to pay on the part of either tenant, except upon

the basis of the use actually had.   There is no express obligation to use. It has been well suggested that, if an owner gives one the right of way over his lands in common with others at a certain compensation for each use of the right of way, an obligation to use is not imposed; the extent of the use being optional.   We find in these various instruments no express covenant to use.

There is at least one provision in the agreement of July 1, 1902, called the "joint supplemental" lease, which is in antagonism to any idea of an express obligation to use.   By the terms of the leases there was an express obligation on the part of the lessee to pay the specific rental during the term for the exclusive property held by it.   The thirty-second paragraph of the lease referred to has reference to this exclusive property.   It gives to each lessee, upon surrender of consolidated mortgage bonds equal at their par value to the total original cost of each lessee's exclusive property, a right to receive a deed of the property from the Western Indiana Company, with the release thereof from the consolidated mortgage, and provides that such property, so conveyed, should not be sold or leased or conveyed by the grantee, except that the Western Indiana Company and, after it, each of the other lessees, should first have the option of buying the property at the original cost and interest, or of leasing the same at a specified sum, and, upon failure to exercise such option, the grantee should have the absolute right of disposition of the property.   By this provision a lessee could stop payment of rental of the exclusive property at any time, notwithstanding the obligation to pay during the entire term.   It is true that this paragraph was abrogated by the agreement of December 29, 1903, but that cancellation does not do away with the effect that the paragraph should have upon the construction of the contract of 1902.   It seems quite inconsistent with the theory of a covenant to use the common property that the lessees should have the right of acquisition and of disposition over the exclusive property.

It also seems to us that the practical construction placed by the parties upon these contracts during a quarter of a century of action thereunder is not consistent with the existence of a covenant to use.   The several instruments imposed like obligations upon both the appellants and the appellee as to every part of the common property, including the railway from Dearborn Station to Dolton, and the railway from Hammond Junction to the state line.   The Dolton branch has never been used by the appellants, nor has the Hammond branch ever been used by the appellee or by the Grand Trunk.   The appellants have not contributed to the maintenance and operating expenses of the Dolton branch nor have the appellee and the Grand Trunk contributed to the maintenance and operating expenses of the Hammond branch, nor have they been required to do so.   The lessee companies have had the same right to use the nine passenger stations between Eighty-Third street and Dearborn Station that the appellee has had.   The paragraph in the leases to that effect provides that the lessee has the right to use upon the terms stated any passenger station which may be erected upon the main line, and, if the lessee should wish to use such other or additional depot, it shall have the right to do so upon terms as favorable as those conceded to the Eastern Illinois Company.   The obligation to use the Dearborn Station

is no greater than that contained in the provision referred to. The appellee has used these nine passenger stations. The appellants have refrained from their use, and have severally declined to pay for their use and maintenance, operation, repair, renewals, and taxes. The several lessees have diverted to the terminals of other railroad companies freight cars and trains consigned to the city of Chicago as was deemed convenient for the accommodation of the consignees. That course of business seems to have been recognized as a right of each party, and none of the leases make distinction between freight and passenger traffic or the rights or obligations of the parties in relation thereto. We think, therefore, that the practical construction placed upon these leases by the parties in interest supports the construction which we are constrained to give them, that, with respect to the "common property," there was no covenant to use, but merely a covenant to pay certain charges in the proportion that its use by the covenantor bore to the whole use.

It is further urged that the court should imply a covenant on the ground that it is necessary to aid the execution or performance of the express covenant of the Western Indiana Company to maintain the road and the station. We need not be curious to ascertain the limit which the law places upon the doctrine of implied covenants, or to consider that question, because, if a covenant to use may properly be implied here, it is to be implied in favor of the Western Indiana Company, the lessor, which is not a party to this suit. It seems to us novel doctrine that a covenant is to be implied in favor of co-tenants, when its implication is not sought by the lessor. The bill, seeking to establish such an implied covenant, affects corporate rights and liabilities of a corporation that is not a party to the bill and such rights are enforceable only by the corporation affected, and in such case the corporation is not merely a necessary, but an indispensable, party. Swan Land & Cattle Company v. Frank, 148 U. S. 603, 13 Sup. Ct. 691, 37 L. Ed. 577. As was said by the court in that case, no decree made could conclude the absent party.

"The defendants cannot be required to litigate those questions which primarily and directly involve issues with third parties not before the court."

See, also, Minnesota v. Northern Securities Company, 184 U. S. 199, 22 Sup. Ct. 308, 46 L. Ed. 499.

The appellants, as lessees of the Western Indiana Company, and without the presence of the latter company, seek to have established, by construction of a contract made between the latter company and a third party, covenants to use, which shall endure for nearly 1000 years. Such covenants, if established, would run to and inure to the benefit of the Western Indiana Company, and could only properly be enforceable by it. Finding no covenant here on the part of the Eastern Illinois Company running to the appellants or either of them, we are not able, without the presence of the Western Indiana Company, to establish and enforce covenants in favor of the latter company, although the appellants might be pecuniarily benefited by the establishment of such right on the part of the Western Indiana Company.

The decree is affirmed.

NOTE.—The following is the opinion of Seaman, District Judge, in the court below:

SEAMAN, District Judge. The bill is founded on the alleged contract obligations of the defendant under so-called leases or trackage and terminal agreements with the Chicago & Western Indiana Railroad Company, wherein the complainants have rights and interests as co-tenants under certain supplemental agreements and a so-called "joint supplemental lease." Relief in equity is sought upon the two-fold contentions: (1) That the contracts obligate the defendants to use the tracks and station for all passenger trains throughout the term specified, and (2) that no adequate remedy for the breach thereof is afforded at law. Both of these propositions are controverted on behalf of the defendant, and these further objections are urged against the relief prayed for: (3) That the Western Indiana Company is a necessary party to the controversy in any view of the contract, and (4) that public policy forbids enforcement in equity. I appreciate the importance of the interests and questions involved, and have carefully considered the contracts, the various contentions, and the authorities cited. The need is obvious for an early decision, and an extended discussion of the grounds thereof is neither practicable nor can it serve any useful purpose for an ultimate review. So a brief summary of my conclusions will premise the entry of decree. The objections referred to which do not touch the merits of the controversy are none of them free from difficulty, but I am so strongly impressed with the view that the contracts in suit are not entitled to the construction sought on behalf of the complainants that the determination will rest mainly thereon. For orderly consideration the points are taken up inversely.

1. As to jurisdiction in equity. On the theory of the bill that a covenant for use, either express or implied, appears in the contracts, while it is true that the wheelage charges for maintenance would remain ascertainable after diversion of trains to the Rock Island station, I am not satisfied that the remedies at law for breach would be adequate to the extent of barring equitable jurisdiction. The authorities cited sanction relief by injunction where the contract obligation is unmistakable and no public interests are involved. So the objection to the jurisdiction is overruled.

2. Is the Western Indiana Company a necessary party to the bill? I am of opinion that this objection is well taken, under the general rule (Swan Land & Cattle Co. v. Frank, 148 U. S. 603, 610, 13 Sup. Ct. 691, 693, 37 L. Ed. 577) that "the defendant cannot be required to litigate those questions which primarily and directly involve issues with third parties not before the court." The so-called lessor is the primary party in interest, and the incidental interest of the co-tenants will not authorize final adjudication, as I view it, without the presence of the lessor.

3. The question whether enforcement of the alleged covenant would be contrary to public policy is not clearly ruled by any authority cited; but, if its solution were deemed controlling, I am impressed with the view that there is force in this objection. Specific performance of the alleged covenant is sought by way of injunction, and it is the settled rule of equity to extend no aid "unless it is in accordance with policy to grant the help," as such relief upon contracts "is the exception, and not the rule, and courts would be slow to compel" performance "in cases where it appears that paramount interests will, or even may, be interfered with by their action." Beasley v. Texas & P. Ry. Co., 191 U. S. 492, 497, 24 Sup. Ct. 164, 166, 48 L. Ed. 274. The railroad is a public utility and the interest and convenience of the public must be recognized, so that equity will not interfere to enforce the covenant in controversy, if found in the contracts, unless it is free from liability to affect public interests, but will leave the parties to their redress at law, with the defendant company at "liberty to follow the course which its best interests and those of the public demand." Id.; Texas, etc., Ry. Co. v. Marshall, 136 U. S. 393, 405, 10 Sup. Ct. 846, 849, 34 L. Ed. 385. The contentions on the one side and the other as to advantages or disadvantages of the respective stations in structure, use, and location do not seem to present serious difficulty; but the fact that the tracks are now elevated in the one case and not in the other—though work is in progress to that end—with other phases which appear or may arise, would make it questionable, to say the least, whether a covenant

141 F.—51

clearly expressed to make no change of station would be enforced in equity under the doctrine thus indicated.

4. Are the so-called leases in suit obligatory for use of the Western Indiana station throughout the term? The inquiry thus presented is the main subject of controversy between the Western Indiana Company and the defendant, whereby the latter obtained and preserved its entry into Chicago with excel- lent terminal and station privileges, were obviously prepared with deliberation, skill, and forethought, and the final contract of July 1, 1902, called the "joint supplemental lease" (wherein the complainants were joined as several parties), with the supplement thereto of December 29, 1903, were framed and executed in the light of and with reference to all the prior arrangements, understandings, and conditions. That none of the successive agreements were leases, in the legal sense of that term, is unquestionable under the authorities (Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 583, 593, 16 Sup. Ct. 1173, 41 L. Ed. 265; Chicago, Rock Island Ry. Co. v. Rio Grande R. R. Co., 143 U. S. 596, 618, 12 Sup. Ct. 479, 36 L. Ed. 277); the grant being "the right and privilege to move and operate its trains over the tracks" and to and from the station (163 U. S. 593, 16 Sup. Ct. 1173, 41 L. Ed. 265). The two cases, therefore, cited in support of an implied covenant for use—So. Ry. Co. v. Franklin Ry. Co. (Va.) 32 S. E. 485, 44 L. R. A. 297, and Schmidt v. Ry. Co. (Ky.) 41 S. W. 1015, 38 L. R. A. 809—are not strictly applicable, though instructive. Examination of the terms in the several instruments pointed out on behalf of complainants as express covenants for use, on reference to the context, fails to convince me that such interpretation is authorized. The strongest expression cited to that end appears in the ninth provision of the agreement of August 1, 1890, and subsequently renewed; but, as well indicated in the brief for the defendant, the construction sought is not borne out by the other provisions and the obvious understanding of the parties, especially in its insertion in the joint agreement of 1902, with the independent uses of various portions of the tracks there contemplated. The parties were equally capable and well advised to make an express covenant in clear terms. if such were intended, and I am of opinion that the court cannot construe the vague general terms referred as expressing such intention.

The more difficult question is whether the covenant will be implied from all or any of the instruments, considering their nature and the circumstances of the case. The general rules which govern the interpretation are well settled and need no repetition; and, otherwise than by way of exemplification of those rules, no authority is called to my attention which seems to be in point, except that of Hudson Canal Co. v. Pennsylvania Coal Co., 8 Wall. 276, 284, 288, 19 L. Ed. 349. Under the rules referred to and on the authority of that case—which is not modified by Railroad Co. v. Richmond, 19 Wall. 584, 22 L. Ed. 173, cited on the briefs—I am satisfied that no implication arises to support the complainants' contention of covenant to use the Western Indiana station throughout the term. The parties have carefully refrained from exacting or entering into express covenant to that effect—plainly departing from terms in the preliminary Brown agreement of May 6. 1879, which might have borne such interpretation—and none can be imposed by the court under the terms so selected and renewed by the parties. Moreover, the view of public policy, before stated, would forbid such implication.

In conformity with these views, the bill must be dismissed for want of equity, and decree may be prepared to that end.