MOTTLEY et al. v. LOUISVILLE & N. R. CO.

(Circuit Court, W. D. Kentucky. February 2, 1907.)

1. COURTS—FEDERAL COURTS—JURISDICTION.

Judiciary Act 1887 (Act March 3, 1887, c. 373, 24 Stat. 552), as amended by Act Aug. 13, 1888, c. 866, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508] gives Circuit Courts of the United States original jurisdiction of civil suits where the matter in controversy exceeds in value $2,000 and arises under the Constitution or laws of the United States. *Held*, that a federal Circuit Court had jurisdiction to compel an interstate carrier to specifically perform a contract to issue free passes to complainants during their natural lives, which the carrier had refused to do because of the provisions of Act Cong. June 29, 1906, 34 Stat. 584, c. 3591, prohibiting a carrier from issuing free interstate transportation, complainants having al-

leged that the value to each of them of the right sought to be enforced exceeded $2,000, exclusive of interest and costs.

[Ed. Note.—Jurisdiction of Circuit Courts as determined by the amount in controversy, see note to Auer v. Lombard, 19 C. C. A. 75; Tennent Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

2. CARRIERS — INTERSTATE TRANSPORTATION — PASSES — OBLIGATION OF CONTRACTS.

Act Cong. June 29, 1906, §§ 2, 6, 34 Stat. 584, c. 3591, prohibiting interstate carriers from issuing free transportation or receiving different compensation for transportation of passengers or property between points named in published tariffs than the rates, fares, and charges specified in the tariffs, etc., did not invalidate a contract made October 2, 1871, by which an interstate carrier, in consideration of a release of damages for injuries to complainants, contracted to issue free passes over its lines to complainants during their natural lives, nor did such act authorize the carrier to refuse longer to issue passes good beyond the boundaries of the state.

Wright & McElroy, for complainant.

H. L. Stone, B. D. Warfield, and E. W. Hines, for defendant.

EVANS, District Judge. On the 2d day of October, 1871, the complainants and the defendant entered into an agreement in writing in terms as follows:

"Louisville, Ky., Oct. 2nd, 1871.

"The Louisville & Nashville Railroad Company in consideration that E. L. Mottley and wife, Annie E. Mottley, have this day released Company from all damages or claim for damages for injuries received by them on the 7th of September, 1871, in consequence of a collision of trains on the railroad of said Company at Randolph's Station, Jefferson county, Ky., hereby agrees to issue free passes on said railroad and branches now existing or to exist, to said E. L. & Annie E. Mottley for the remainder of the present year, and thereafter, to renew said passes annually during the lives of said Mottley and wife or either of them.                    Thos. J. Martin,

"For Louisville & Nashville Railroad Co.

"Willis Ranney, Sec. [Seal.]"

This agreement was accepted by the complainants, and, pursuant thereto, the defendant from its date until January 1, 1907, namely, for each of the next succeeding 35 years, issued to the complainants the passes it thereby stipulated to issue. At the date last named the defendant, conceiving itself bound to do so under the requirements of an act to amend an act entitled "An act to regulate commerce," approved February 4, 1887 (24 Stat. 379, c. 104 [U. S. Comp. St. 1901, p. 3154]), and acts amendatory thereof, and to enlarge the powers of the Interstate Commerce Commission, approved June 29, 1906 (34 Stat. 584, c. 3591), refused to issue any further passes over its railroad and branches which extend into many states of the Union, but it did offer to issue free passes over so much of said railroad and branches as were located in the state of Kentucky. The complainants, contending that they were entitled under their contract to free passes over the defendant's entire railroad and all its branches wherever located and operated, declined the offer of the defendant of passes limited to the state of Kentucky. The complainants have brought this suit to compel the defendant to specifically perform the stipulations of the contract, and the defendant has filed a general demurrer to the bill.

The judiciary act of 1887 (Act March 3, 1887, c. 373, 24 Stat. 552), as amended by the act of 1888 (Act Aug. 13, 1888, c. 866, 25 Stat. 433), gives the Circuit Court of the United States original cognizance, concurrent' with the courts of the several states, of suits of a civil nature at common law or in equity where the matter in dispute exceeds, exclusive of interest and costs, the sum or value of $2,000 and arising under the Constitution or laws of the United States. U. S. Comp. St. 1901, p. 508. The interpretations by the Supreme Court of this provision, when considered in connection with the averments of the bill, leave no room for doubt that the court has jurisdiction of this action; the bill also making averments showing that the value to each of the complainants of the right sought to be enforced exceeds $2,000, exclusive of interest and costs. It is only necessary to cite in this connection the opinion of the Supreme Court in Patton v. Brady, Ex'x, 184 U. S. 608, 22 Sup. Ct. 493, 46 L. Ed. 713. That opinion, with the cases referred to in it, seems to leave nothing further to be said upon the question of jurisdiction. The contract set out in the bill was with both complainants; but no point is made by the defendant, and none need be made by the court, that their causes of action may possibly be several. The parties seem to agree that one suit is as good as two for the purpose of settling the rights involved, and we are not called upon nor required to question that conclusion, which, indeed, may be the proper one. The demurrer itself only raises the question whether the complainants or either of them should have any relief. There could be no doubt upon that proposition but for certain provisions of the act of June 29, 1906. The complainants had each in 1871 been greatly injured by the negligence of the defendant, and claimed compensation and damages therefor. That claim was acknowledged by the defendant, but for reasons satisfactory to the parties the complainants agreed, in lieu of money, to take transportation as provided for in the contract in settlement of their claims. This form of settlement the parties had a perfect right to agree upon, and the result was the contract above set out in full. The defendant, while admitting all of these propositions, nevertheless says that it cannot longer lawfully perform its contract with the complainants, except to the extent of issuing passes over its railroad and branches in the state of Kentucky for the reason that the act, by its first section, expressly provides that "no common carrier subject to the provision of this act shall, after January first, nineteen hundred and seven, directly or indirectly issue or give any interstate free ticket, free pass or free transportation for passengers except to its employees and their families," and many other persons, none of whom answer the description of either one of the complainants, and for the further reason that section 2 of the said act provides that section 6 of the act, to which it is an amendment, shall be further amended as follows:

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this Act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or prop-

erty, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time."

Manifestly the two provisions of the act just copied might prohibit the making thereafter of contracts similar to the one made with the complainants in 1871, and it is insisted that as the case of the complainants is not expressly saved by any of the provisos or exceptions mentioned in section 1 of the act, and as the clause quoted from section 2 makes no exceptions, the complainants' contract is destroyed and annulled by the force of those provisions. Whether this view is the correct one is the very important question to be solved, while we bear in mind, on the one hand, that the complainants are threatened with the loss of a valuable right, and, on the other, that the defendant, and, indeed, the complainants as well, may be visited with serious criminal penalties if further performing the agreement must now be regarded as unlawful. Of course, contracts like the one sought to be enforced are extremely rare—so rare that presumably they did not, in fact, come within the contemplation of Congress when it was perfecting sections 1 and 2 of the act of 1906. Nevertheless, the truth is that upon a highly valuable consideration the parties stipulated that for the settlement of a just and acknowledged claim for compensation for personal injuries the defendant, in lieu of paying money, would furnish to the complainants all the transportation they wanted for themselves personally over all its lines for the full period of the natural lives of the complainants, respectively. The words "free pass," as used in the contract, add nothing to the controversy; for the transportation to be furnished was all paid for by the complainants, and the passes, while called "free," were in fact no more "free" than is an ordinary ticket issued to a traveler after it has been paid for in cash. Did Congress intend to abrogate such previously made contracts founded upon valuable and legitimate considerations? Certainly it did not say so. Was the abrogation of such pre-existing contracts within the policy of the legislation referred to? There is nothing to indicate that it was, although it is obvious that contracts of a similar nature could not be made after the act became effective. Was it the policy of Congress to annul any previously made contract founded upon good consideration? Except through the bankruptcy act, it is difficult to reach the conclusion that Congress ever passes an act designed to impair the obligation of any contract theretofore lawfully and fairly made upon valuable consideration. True Congress is not, although the states are, prohibited by the Constitution from passing any law impairing the obligation of contracts, but there is a moral obligation and stress upon Congress not lightly to do so, which we believe always is as effective upon that body and its conscience as would be a constitutional inhibition. If these propositions be true, then we should construe the act as containing an exception to the general language used, and hold that the issuing of the free passes provided for in the contract was not meant to be prohibited by the statute. Do the authorities justify us in doing this? The question is one of interpretation, and in our efforts to solve it we may bring to our aid certain well-established rules of construction.

Our Blackstones taught us the lesson which Endlich, in section 25 of his work on the Interpretation of Statutes, has amplified. He says:

"Language is rarely so free from ambiguity as to be incapable of being used in more than one sense; and to adhere rigidly to its literal and primary meaning in all cases would be to miss its real meaning in many. If a literal meaning had been given to the laws which forbade a layman to lay hands on a priest, and punished all who drew blood in the street, the layman who wounded a priest with a weapon would not have fallen within the prohibition, and the surgeon who bled a person in the street to save his life would have been liable to punishment."

In the case of Estate of Ticknor, 13 Mich. 51, the Supreme Court of that state said:

"Legislatures, like courts, must be considered as using expressions concerning the thing they have in mind; and it would not be a fair method of interpretation to apply their words to subjects not within their consideration, and which, if thought of, would have been more particularly and carefully disposed of."

In Jefferys vs. Boosey, 4 H. L. 815, the House of Lords laid down the rule that:

"General words do not always extend to every case which literally falls within them."

Outside and unthought of facts and circumstances may develop a latent ambiguity, when the literal words of a statute come to be considered in connection with them; and in such cases the courts must interpret the language of the statute without losing sight of those facts, especially when a retroactive operation of the statute might destroy vested rights or otherwise work gross and possibly irremediable injustice altogether, without such results having been within the contemplation of the legislative body.

Unquestionably in this case the first matter for consideration is the intention of Congress. That general intention cannot be misconceived nor misunderstood. It was, under the commerce clause of the Constitution, to regulate the rates which common carriers engaged in interstate commerce were to charge and receive for the carriage of property and passengers in such commerce. The details of the act were arranged for the purpose of effectuating that general intention. Hence the provisions which have been copied above. In terms there is no clause in the act which would except agreements like the complainants from the control of those provisions. Yet complainants had already in 1871 paid in full for the transportation their contract calls for, and that payment had then imposed upon the defendant the legal obligation to carry complainants as passengers over its railroad and all its branches at any time they or either of them desired to travel thereon during their respective lives. Notwithstanding the general purpose of the act and notwithstanding the general language used therein, must we conclude that Congress intended to deal with the very unusual case of contracts like that with the complainants, whereby they had already contracted and paid for their own transportation as passengers over defendant's lines? Complainants, by paying for it, had acquired a vested right,

certainly as between them and the defendant, to the thing the latter contracted to deliver. Under these circumstances, is it fairer or more nearly right to assume that Congress meant to destroy this vested right without requiring the defendant to reimburse to complainants the money potentially paid for the service than it is to assume that Congress meant to do no such unjust and unnecessary thing even by the general language of the act? The invalidation of the complainants' contract would have no appreciable effect upon the general operations of the act, and would, therefore, be practically as unnecessary as it would be unjust. Such invalidation could be justified upon no principle which would aid in the general purposes of the legislation, but would be the wanton infliction of an unnecessary wrong. We are unwilling, therefore, to impute to Congress a deliberate intention of that character, and we believe the authorities justify this reluctance.

In United States v. Kirby, 74 U. S. (7 Wall.) 486, 487, 19 L. Ed. 278, the Supreme Court laid down this general rule:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will also, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of that character. The reason of the law in such cases should prevail over its letter."

In Carlisle v. United States, 16 Wall. 153, 21 L. Ed. 426, the court thus stated the proposition:

"All general terms in the statutes should be limited in their application, so as not to lead to injustice, oppression, or any unconstitutional operation, if that be possible. It will be presumed that the exceptions were intended which would avoid results of that character."

This familiar rule was again reaffirmed in practically the same language in Chew Heong v. United States, 112 U. S. 555, 5 Sup. Ct. 255, 28 L. Ed. 770. In Market Co. v. Hoffman, 101 U. S. 116, 25 L. Ed. 782, the court stated a kindred rule as follows:

"In Brewer's Lessee v. Blougher, 14 Pet. 78, 1~ L. Ed. 408, it was said to be the undoubted duty of the court to ascertain the meaning of the Legislature from the words used in the statute, and the subject-matter to which it relates, and to restrain its operation within narrower limits than its words import, if the court is satisfied that the literal meaning of its language would extend to cases which the Legislature never designed to include in it."

In Knowlton v. Moore, 178 U. S. 77, 20 Sup. Ct. 761, 44 L. Ed. 969, the court said:

"We are, therefore, bound to give heed to the rule that where a particular construction of a statute will occasion great inconvenience, or produce inequality and injustice, that view is to be avoided if another and more reasonable interpretation is present in the statute."

It may also be appropriate and applicable to say that in Cook v. United States, 138 U. S. 181, 11 Sup. Ct. 268, 34 L. Ed. 906, the court stated it to be a "settled rule that the courts uniformly refuse to give to statutes a retrospective operation where the rights previously vested are injuriously affected, unless compelled to do so by language so clear

and positive as to leave no room to doubt that such was the intention of the Legislature."

In the case before us the statute, if literally construed, would have a manifestly retrospective operation upon the contract by annulling what had become valid over 35 years ago, and which had been acted upon by the parties for that entire period. Certainly the statute in this case does not by any language used therein clearly or expressly indicate that such contracts were intended to be affected by its provisions, and we conclude, upon the authorities cited and upon all the considerations we have suggested, that the act of June 29, 1906, should be construed precisely as if, in its general language, there was an express exception excluding from its operation the complainants' contract. The authorities clearly authorize the court to so construe it. In no other way can the vested contract rights of the complainants be preserved. In no other way could gross injustice be avoided, especially as no way to reimburse or compensate the complainants is provided. In so construing the act, we proceed upon established principles, and do no violence to the general policy of Congress—imputing to it, as we do, the intention to deprive no one of rights lawfully acquired and vested long before June 29, 1906.

The case of Railroad Company v. Richmond, 19 Wall. 584, 22 L. Ed. 173, is not strictly analogous, but certain parts of the opinion of the court delivered by Mr. Justice Field may throw additional light upon the subject. Speaking of the acts of Congress then under discussion the court, at page 589 of 19 Wall. (22 L. Ed. 173), said:

"They were not intended, even if it were competent for Congress to authorize any such proceeding, to invade the domain of private contracts, and annul all such as had been made on the basis of existing legislation and existing means of interstate communication. Contracts valid when made continue valid, and capable of enforcement, so long, at least, as peace lasts between the governments of the contracting parties, notwithstanding a change in the conditions of business which originally led to their creation. The power to regulate commerce among the several states was vested in Congress in order to secure equality, and freedom in commercial intercourse against discriminating state legislation. It was never intended that the power should be exercised so as to interfere with private contracts not designed at the time they were made to create impediments to such intercourse."

In Addyson Pipe & Steel Co. v. United States, 175 U. S. 233–355, 20 Sup. Ct. 96, 44 L. Ed. 136, the court had occasion to distinguish that case from the Richmond Case, but did not allude to the fact that the contract in the case then before it was made in 1894, long after the anti-trust act, which the court was considering, was passed in 1890. That contract was in plain violation of the law then in force, just as Mottley's contract, if made now, might be in violation of the act of June 29, 1906, and the general words used by the court (as it often reminds us) are to be applied to the exact case before it. Besides, in the Addyson Pipe Company Case the contract was by no means based upon a valuable consideration actually paid before the prohibiting law was enacted, but was simply an agreement based upon mutual promises to form an unlawful combination. For these reasons we conclude that there is nothing in the Addyson Pipe Company Case that overrules or conflicts

with any of the cases which we have cited in support of the construction we have given to the act of June 29, 1906.

We have been cited to certain cases which deal with the power of Congress or state Legislatures to enact laws which make it unlawful, and therefore legally impossible, to perform certain classes of agreements which were lawful when made. But we take it that in all such cases the legislative intent to reach and to override existing agreements, particularly if valuable property rights have thereunder become vested, must be very clear and unmistakable. As no such intent is expressly or clearly shown in the act of 1906, if, indeed, such intent be shown in the least degree, the cases cited by counsel are not persuasive, especially as the nature of the agreements then in contention, and whether they were based upon valuable considerations already paid by one party and received by the other was not clearly shown at the argument. At all events, we have reached the conclusion that, if the averments of the bill are true, the complainants are entitled to relief in equity, it being quite apparent from the nature of the case and from the uncertainty of human life that a remedy at law would not be plain, or complete, and certainly not so adequate as would be a specific performance, which, if had, will meet the exact justice and right of the case, while an action for damages for a breach of the contract, even if maintainable, might not do so, inasmuch as one would be based upon the exact lifetime of each complainant, while the other could only be estimated upon mere life probabilities.

The demurrer will be overruled.