UNITED STATES v. CHICAGO, I. & L. RY. CO.

(Circuit Court, N. D. Illinois, E. D.   July 15, 1908.)

No. 28,711.

CARRIERS—INTERSTATE COMMERCE—DISCRIMINATION IN RATES.

A contract by a railroad company to furnish to the publisher of a magazine, as called for, transportation amounting to a certain sum at schedule rates in payment for a stated amount of advertising, which has no fixed value, is in violation of the provision of section 6 of the interstate commerce act, Act March 2, 1889, c. 382, 25 Stat. 855 (U. S. Comp. St. 1901, p. 3156), as amended by Hepburn Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 895), prohibiting any carrier from accepting "greater or less or different" compensation than that named in the published schedules.

Edwin W. Sims, U. S. Atty., James H. Wilkerson, Sp. Asst. U. S. Atty., and L. A. Shaver, Solicitor for Interstate Commerce Commission, for the United States.

E. C. Field, G. W. Kretzinger, and H. R. Kurrie, for defendant.

KOHLSAAT, Circuit Judge.   The government files its petition herein under the provisions of section 3 of the act of February 19, 1903 (U. S. Comp. St. Supp. 1907, p. 882), creating a summary remedy in certain cases, and seeks thereby to prevent the defendant from giving transportation in exchange for advertising, in accordance with the terms of a contract entered into between defendant and Munsey's Magazine, which reads as follows:

"Agreement between the Monon Route (Chicago, Indianapolis & Louisville Railway Company) and Frank A. Munsey Co., publisher, entered into this 24th day of January, 1907.

"Whereas, the said publisher issues Munsey's Magazine, a publication published at New York City, N. Y. (Chicago office, 423 Marquette Bldg.), and which has a regular circulation of 643,000 each issue; and whereas, the said Monon Route desires to advertise in said publication, which advertising the said publisher agrees to do upon the following terms and conditions, which are mutually agreed upon:

"(1) The said publisher agrees to publish in said publication an advertisement of the Monon Route as follows:   One page 'ad' (divided as desired), said advertisement to appear favorably and occupy a space of not less than one page, and to be published as desired issues of said publication.

"(2) In full consideration of the foregoing advertising, the Monon Route agrees to issue the following nontransferable transportation, based on the regular published rate:   Trip tickets or mileage to the value of five hundred dollars ($500.00), for the personal use of the publisher, his employés, or immediate members of his or their families, which said transportation shall be limited for use not later than December 31, 1907.

"(3) Under no circumstances must the transportation issued under this contract be sold or transferred to or used by any other than the person to whom issued, as such sale, transfer, or use would be a misdemeanor under the law.

"(4) It is understood and agreed that the transportation issued under this contract shall read to points on the Monon Route, and not to points on any other road.

"(5) No extension of time on any transportation issued under this contract shall be given by the Monon Route or requested by the publisher beyond the date of the expiration of this contract.

"(6) In case said publisher severs connection with said publication, or sells or transfers his interest therein, then said transportation shall at

once be surrendered to the Monon Route, and no new transportation shall be issued on account of said publication until after that originally issued has been returned to the Monon Route. Should any person holding transportation issued hereunder sever connection with the publication, or should the publication suspend, or if the transportation should be presented by any person other than to the one named thereon, then the Monon Route will refuse to honor the same for passage, and take the same up and collect full fare, and such presentation shall be taken and considered as a breach of contract; and it is hereby agreed that the suspension of said publication before the expiration of this contract, or the presentation of nontransferable transportation by any other than the person named thereon shall cause this contract to be void and operate as an offset to all transportation which might be considered as due to said publisher. Further, should said publisher or any person named on said tickets allow any other person to use same, or offer to sell, sell, or transfer the same, then said publisher agrees to pay the said Monon Route as a penalty the full rate of fare which would have been paid for regular tickets.

"(7) The said publisher further agrees to deliver to said Monon Route, at its general office in Chicago, one copy of each issue of said publication in which said advertisement appears, free of charge, during the life of this contract.

"(8) This contract expires December 31, 1907, unless otherwise stipulated."

The petition charges that the action of the defendant in issuing such transportation constitutes a violation of the statute, which prohibits a carrier from accepting in payment for transportation any compensation greater or less or different from that named in the published rates. Defendant insists that it receives full money value for what it grants, at regular schedule rates, and denies that the transaction comes within the act. It also sets up the Indiana act authorizing such exchange. This latter defense cannot be availed of in this proceeding. The matters in issue are concededly interstate commerce transactions, as to which, it is well settled, a state statute is ineffectual. The federal law alone applies.

Practically the question submitted is whether transportation supplied in accordance with the terms of the contract constitutes a rate greater or less than, or different from, that given the general public. The question as to the value of the advertising is a contested one. Manifestly, there can be no fixed price placed upon it. The number of copies issued, the character of its subscribers, and very many other questions, enter into the estimate of its worth. It is, therefore, impossible to say what its cash or market value is, except by comparison with other advertising rates. It cannot be said that the evidence is conclusive, or even convincing, on the point. Indeed, if it is taken at its cash value, why should the transportation be limited as specified in the contract? If the magazine is paying $500 to the defendant, why does it accept transportation both of less and different value than it would accept if it bought its tickets with money? Why embarrass itself with menacing pains and penalties for failure to observe all the conditions of the special contract, when by the use of cash it may travel and give no concern to technical limitations?

It seems fair to conclude that either the advertising is of less than cash value, or the advertisers are grossly imposed upon by the railroad. It does not follow, however, that the transportation furnished under the contract set out is not furnished under substantially similar circumstances and conditions as any other contemporaneous service. It

is the same service, the same act of transportation, as that furnished the public. It is insisted by counsel for complainant that railroad tickets may not, in any case under the interstate commerce act as it now stands, be bartered as so much cash in payment of indebtedness of the railroad. By rule made effective September 15, 1906, the Interstate Commerce Commission has ordered that:

"Nothing but money can be lawfully received or accepted in payment for transportation subject to the act, whether of passengers or property, or for any service in connection therewith, it being the opinion of the commission that the prohibition against charging or collecting a greater or less or different compensation than the established rates in effect at the time precludes the acceptance of services, property, or other payment in lieu of the amount of money specified in the published schedules."

In United States v. A., T. & S. F. R. R. Co., decided by Judge Wellborn, of the Southern District of California, recently (162 Fed. 111), it is said:

"A rate, to be uniform in its operation, must necessarily be expressed in dollars or cents. * * * So to interpret the law as to allow the carrier to disregard said mode, and to accept a part only of its compensation in money and the balance in a commodity, or by way of compromising a claim, would invite and open wide a door to the very discrimination which the statutes were designed to suppress."

In Union Pacific Ry. Co. v. Goodridge, 149 U. S. 680, 13 Sup. Ct. 970, 37 L. Ed. 986, the court had under consideration a demurrer to an answer setting up the satisfaction of what the court terms "an unexplained, indefinite, and unadjusted claim for damages," in regard to which it says:

"While we do not undertake to say that a railroad company may not justify a fixed rebate in favor of a particular shipper by showing a liquidated indebtedness to such shipper, which the allowance of the rebate was intended to settle, it would practically emasculate the law of its most healthful feature to permit an unexplained, indefinite, and unadjusted claim for damages arising from a tort, which, though litigated for some time, never seems to have been prosecuted to a final determination in the courts, to be put forward as an excuse for a clear discrimination in rates."

And further on:

"To hold a defense thus pleaded to be valid would open the door to the grossest frauds upon the law, and practically enable the railroad company to avail itself of any consideration for a rebate which it considers sufficient, and to agree with the favored customer upon some fabricated claim for damages which it would be difficult, if not impossible, to disprove. There is no doubt," says the court, "of the general proposition that a release of an unliquidated claim for damages is a good consideration for a promise as between the parties, and, if no one else were interested in the transaction, that rule might apply here; but the Legislature, upon grounds of public policy and for the protection of third parties, had made certain requirements with regard to equality of rates, which in their practical application would be rendered nugatory, if this rule were given full effect."

It will be noted that the contract does not require that the advertising must have been furnished before the transportation is given. There is no restriction upon the advertiser to call for his railroad tickets only so far as earned. He could, under the contract, demand them all at once if he chooses, and at the beginning of the term, before

anything is earned. In the mere matter of interest, the rate would be less and different from that which is published.

In the case of Mottley et al. v. Louisville & New Orleans R. R. Co. (C. C.) 150 Fed. 406, Judge Evans sustained an agreement made on October 2, 1871, by the road with Mottley and wife for the granting of passes for each of their lives in consideration of their release of their several claims for damages growing out of personal injury. In the course of his opinion (page 409) he says:

"Did Congress intend to abrogate such previously made contracts, founded upon valuable and legitimate consideration? Certainly it did not say so. Was the abrogation of such pre-existing contracts within the policy of the legislation referred to? There is nothing to indicate that it was, although it is obvious that contracts of a similar nature could not be made after the act became effective."

It is of interest, in this connection, to note, as bearing upon the trend of congressional legislation, that on January 14, 1908, a bill was introduced in the United States Senate to amend the law so as to permit public carriers to issue transportation in exchange for advertising, and that the bill was, by unanimous vote of the committee having it in charge, reported upon adversely.

Transactions such as those under consideration may not be open to the specific objection condemned in the Goodridge Case; but they would, seem to present just as convenient a device for evading the statute as the one there stated. So far as the record discloses, the particular matters here involved might not be open to this objection; but there is more included than the mere question of advertising. As said by Mr. Justice Brown in the Goodridge Case, supra:

"It [the railroad] is bound to deal fairly with the public, to extend them reasonable facilities for the transportation of their persons and property, and to put all its patrons upon an absolute equality."

This case does not come within the terms of the Goodridge Case. The suggestion of the court with reference to liquidated liabilities does not apply to a situation where the indebtedness is by contract made payable only in transportation. In other words, here the railroad is not settling a liquidated liability, but is agreeing to settle a future liability with transportation.

There is no mistaking the trend of the law making and construing powers. Every new step is tending toward a most rigid enforcement of the rule that requires exact equality in the matter of rates. When by the Hepburn act the word "different" was added to the words "greater or less," it is not unfair to assume that Congress intended to make the law more explicit and more difficult to evade. As was said in Armour Packing Company v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681:

"The Elkins act proceeded upon broad lines, and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published, and posted as required by law."

This purpose is even more apparent in the Hepburn act, Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892). The plain intention is to close every avenue against discrimination. Bearing this in mind, the courts have not been, and will not be, disposed to hesitate in giving significance to changes in the language of the statutes as they occur from time to time. "The interstate commerce act," says the Supreme Court in the Armour Case, "is not only to be read in the light of the previous legislation, but the purpose which Congress evidently had in mind in the passage of the law is also to be considered."

It is conceivable that a case may arise in which, from the nature of the facts involved, it might be difficult, if not impossible, to say whether the rate is greater or less than the published rate, which would, nevertheless, be covered by the term "different," within the meaning of the whole act. It is essential to the spirit of the statute that the value of transportation be fixed and certain. In no other way can it be held to be exactly the same to all. If one person may purchase it with advertising, another with labor, and another with produce, the value of which is a matter of agreement between the parties, how can it be said the schedule rate is always maintained? Would not the rate rest in the whim of the carrier? Such is not the intent of the law. To say to one man, "You must pay cash," and to his competitor, "You may pay in service or merchandise at prices we may agree on," be it more or less than the market prices, would seem clearly to constitute such a difference in transportation as is condemned by the act.

Some claim is made by defendant that the government's contention would exclude the use of checks and drafts and bills of exchange. This is without weight. In practical business usage, these instruments pass as cash. They are utterly free from the objections which attach to trade and barter, and are clearly without the ban of the statute. If the foregoing be correct, it follows that, both upon the particular record in this case and upon broad principles of law, the action of the defendant in the premises is in dissonance with the letter and spirit of the interstate commerce act.

The injunction is granted as prayed.