## TYRRELL & GARTH INV. CO. v. AMERICAN TITLE GUARANTY CO. et al.
### No. 10041.

Court of Civil Appeals of Texas. Galveston.

Nov. 27, 1934.

Rehearing Denied Feb. 14, 1935.

Concurring Opinion on Rehearing Feb. 22, 1935.

Franklin & Blankenbecker, of Houston, for appellant.

James V. Allred, Atty. Gen., Sidney Benbow, Asst. Atty. Gen., and Vinson, Elkins, Sweeton & Weems, John C. Townes, Jr., and H. P. Pressler, Jr., all of Houston, for appellees.

James V. Allred, Atty. Gen., and R. G. Waters, Asst. Atty. Gen., for Board of Insurance Commissioners on rehearing.

Stewarts, Maco Stewart, and W. Noble Carl, all of Galveston, amici curiæ on rehearing.

William McCraw, Atty. Gen., and Vernon Coe, Asst. Atty. Gen., for motion for oral argument on rehearing.

LANE, Justice.

Tyrrell & Garth Investment Company, a joint-stock · association, brought this suit against American Title Guaranty Company, W. A. Tarver, W. S. Pope, and Raymond · Mauk, the three last named in their official capacity as persons composing the Board of Insurance Commissioners of Texas. Before the cause was tried, W. A. Tarver ceased to be a commissioner and was succeeded by R. L. Daniel, who was substituted as a party defendant in the place of Tarver.

Plaintiff alleged that it owned a large tract of land in Harris county which it was selling in small subdivisions; that it became necessary that it furnish its respective purchasers satisfactory evidence of its title to the land; that it contemplated that it would take several years to sell all of said land; that sales were being made and would continue to be made on terms of deferred payment and that the purchase price would be payable to plaintiff over a period of years; that in such transactions a form of title would be necessary to be given to purchasers showing good title in plaintiff at the date of each sale; that American Title Guaranty Company was engaged in the business of issuing guaranteed titles and certificates of title to lands; that on March 23, 1927, August 2d and October 17, 1928, the said Title Company in writing made a proposal to plaintiff, which plaintiff accepted on the 15th day of November, 1928, whereby it was agreed that in consideration of the payment of $2,750 to the Title Company by plaintiff to cover the cost of an examination of all abstracts of title and to cover payment for the preparation and prosecution of a curative title suit upon said lands, the Title Guaranty Company would thereafter issue to appellant's purchasers title guaranties in fee covering said subdivided tracts as and when required by appellant at the rate of $2.50 per $1,000 consideration at which sales were made to purchasers. That the Title Guaranty Company further agreed that in the event certificates of title only were desired by purchasers, such certificates would be issued for $1 each, meaning, with respect to certificates of title, that the Title Guaranty Company would, if required, issue its certificates to the effect that the title was good but without obligation of guaranty. That with respect to guaranties of title, such guaranties meant

that the Title Company would guarantee the purchasers against loss by reason of defects in appellant's title.

Plaintiff further alleged that under such contract and agreements it paid said sum of $2,750 to the Title Company; that it filed the suit mentioned and brought to a conclusion such suit; that it and the Title Company operated continuously under said contract until on or about August 11, 1931, and that under said contract the Title Company furnished the guaranteed title and certificates of title at the prices stipulated in the contract when it was requested by the plaintiff to do so; that on or about August 11, 1931, the Title Company insisted upon charging appellant thereafter $7.50 per $1,000 consideration as expressed in its deeds for guaranteed titles upon sales, instead of $2.50 per $1,000 of consideration in accordance with the contract, and refused to proceed with its contract unless said increased prices were paid. That on or about the same date the Title Company refused to issue certificates of title under any condition; that the sole reason why the Title Company breached its contract was that the Legislature of Texas, subsequent to the effective date of the contract, had passed an act (Acts 1929, c. 40, as amended), now known as article 1302a of the Revised Civil Statutes of Texas (Vernon's Ann. Civ. St. art. 1302a), to the effect that the Board of Insurance Commissioners should have the right and duty to fix and promulgate the rates to be charged by title guaranty companies for premiums on policies of guaranteed titles, and that the board had promulgated an order that title guaranty companies should thereafter charge $7.50 per $1,000 of the consideration paid for property, and that no other or different rates than prescribed by the board should be charged or paid, irrespective of the date of any contract. That, moreover, the Board of Insurance Commissioners had failed and refused to prescribe any form whatever for certificates of title and so the Title Company would not issue the latter under any condition.

Copies of the contract and the order made by the Board of Insurance Commissioners, applicable to insurance, became effective June 1, 1931.

Plaintiff further alleged that the Title Company is willing and ready to carry out its contract except for the order of the Board of Insurance Commissioners, whereby the rates are increased beyond those named in the contract, and wherein no form of certificate of title is prescribed or permitted by the board;

that the sole controversy between appellant and the Title Company is whether or not the Title Company can lawfully perform the services it contracted to render appellant at the charges agreed upon between them prior to the passage of the act; that the Title Company is willing to carry out the contract, but that the Board of Insurance Commissioners and the members thereof had informed the Title Company that the board would forfeit its right to do business in Texas if it failed in any instance to charge the rates prescribed by the board and would visit upon the Title Company all the penalties prescribed by the act as for a violation of the same. That such threats and intimidations by the board have unlawfully interfered with the carrying out of the contract, and have solely and alone caused the Title Company to fail to carry it out; that the Board of Insurance Commissioners has no right by virtue of said act to interfere with the contract and the rates set forth therein; that such attempted exercise of a power which it does not possess is an unlawful and tortious interference between appellant and the Title Company directly resulting in the latter's breach of the contract; that the board will revoke the Title Company's certificate of authority to transact business if the Title Company complies with its contract, unless the board is enjoined from its said unlawful interference; that the Title Company had been carrying out its contract for two years and until the board recently began its unlawful interference; that the acts of the Legislature and the order of the Insurance Commissioners, purporting to be authorized thereby, in so far as they intend to affect the contract, are null and void and of no legal force or effect; that they deprive appellant of its constitutional rights both under the State and Federal Constitutions.

Plaintiff alleged in detail the irreparable damages it had suffered and such as it would suffer in the future, and that it had no adequate remedy at law to prevent such damages; it prayed for judgment against the Title Company for specific performance of the contract and that the Board of Insurance Commissioners, their agents and representatives and successors in office, be enjoined from further interference with the performance of the contract and from threatening or from taking any further action against the Title Company to induce it further to breach its contract.

The Board of Insurance Commissioners' answer defends upon its contention that it had the authority to make and enforce the order made by it in June, 1931.

The case was submitted to the court without a jury upon the following agreed statement of facts, the pertinent parts of which are as follows:

"That the plaintiff, Tyrrell & Garth Investment Company, is a joint stock association duly authorized to do business in the State of Texas, and has its principal office and place of business in Harris County, Texas, and that for some time past and now it is carrying on and conducting the business of subdividing and selling real estate in Harris County, Texas.

"That the defendant, American Title Guaranty Company is and has been for many years incorporated under the laws of this State and fully authorized and empowered to carry on and conduct what is known as guaranteeing land titles. That its principal office and place of business is and has been for many years past in Houston, Harris County, Texas.

"That the defendants, W. A. Tarver, W. S. Pope and Raymond Mauk are all residents of Travis County, Texas, and compose the Board of Insurance Commissioners of the State of Texas.

"That on or about November 15, 1928, plaintiff and defendant, American Title Guaranty Company, entered into a contract whereby the American Title Guaranty Company agreed to insure the titles to plaintiff's land for $2.50 per thousand dollars of sale price received by plaintiff on sales, and further agreed to issue certificates of title for one dollar each, meaning, with respect to such certificates of title, that the American Title Guaranty Company would issue its certificate to the effect that it had examined the title and that, in its opinion, the title was good, and that such contract was to run until all of a certain tract of land owned and subdivided by the plaintiff was sold. That at the time this contract was entered into, there was no law of this State regulating or controlling the rates a title insurance company should charge with reference thereto.

"That subsequent to the execution of the above mentioned contract the Legislature of the State of Texas passed a statute which became a law of the State on February 27, 1929, which was thereafter amended by Acts of the Legislature, 1931, making it the duty of the Board of Insurance Commissioners thereafter to fix and promulgate the rates to be charged by title guaranty companies for premiums on policies of guaranteed title and that such companies could only operate in the event they complied with the provisions of these laws (Acts 1929, c. 40, § 3 (Vernon's Ann. Civ. St. art. 1302a, § 3). That in pursuance to the authority vested in the Board of Insurance Commissioners it passed rules and regulations establishing the rates to be charged by title insurance companies, the same becoming effective on or about June 1, 1931, wherein it was provided by said Board of Insurance Commissioners that the uniform rate to be charged by all companies insuring titles would be one-half of one per cent. with a minimum charge of $7.50 per guaranty certificate, copy of said order of the board being attached hereto, incorporated herein, marked Exhibit A, made a part hereof and referred to herein for a more particular description of the rates therein promulgated.

"That the Board of Insurance Commissioners further provided that no company, including the American Title Guaranty Company, could charge any other rate than the rate prescribed in this order even though it had entered into contracts for different rates, which contracts were entered into prior to the passage of the act of the Legislature above referred to and the establishment of the rates by the Board of Insurance Commissioners as above mentioned.

"That the Board of Insurance Commissioners of the State of Texas has threatened to, and will, revoke the certificate of authority issued by that department to the American Title Guaranty Company to carry on and conduct a title insurance business in the State of Texas, if it continues to charge the plaintiff any other rate than that provided by the Board of Insurance Commissioners even though the plaintiff does have a contract with the American Title Guaranty Company, as fully alleged in plaintiff's petition, which was in full force and effect prior to the laws passed by the Legislature, to charge a lesser rate.

"That in conformity with said law the Board of Insurance Commissioners did hold a hearing, after due notice as prescribed and directed by the statute, that it was going to have a hearing for the purpose of determining what would be reasonable and uniform rates to be charged by insurance companies conducting and carrying on title insurance business prior to the promulgation of said rates, and that each and every such company, including the American Title Guaranty Company and the plaintiff, had opportunity to appear and be heard and offer evidence with reference to the same. That after notice and hearing as provided by the statutes, and a full and complete investigation of all matters fully, the Board of Insurance Commissioners

determined that companies carrying on and conducting such business should charge the rates as alleged in plaintiff's petition; that plaintiff and American Title Guaranty Company did not register objections thereto, nor did plaintiff or American Title Guaranty Company appeal from the order as made and entered by the Board of Insurance Commissioners.

"That the defendant, Insurance Commissioners, and the American Title Guaranty Company, admit the contract with the plaintiff as alleged in plaintiff's petition and that the American Title Guaranty Company is ready, able and willing to carry out the same fully, according to the terms thereof, provided the Board of Insurance Commissioners does not interfere with the performance thereof by threatening to or revoking its certificate of authority to carry on and conduct title insurance business within the State of Texas."

Upon such agreed statement of facts the trial court, in effect, held that the pre-existing contract between Tyrrell & Garth Investment Company and the American Title Company as to rates and charges for title insurance certificates is rendered void by the subsequent passage by the Legislature of an act, now article 1302a, Revised Civil Statutes of Texas, which went into effect on the 27th day of February, 1929, amended by acts of the Legislature in 1931, and the subsequent order passed by the Board of Insurance Commissioners, which went into effect on the 1st day of June, 1931, about a year and a half after the contract of the parties was entered into, and long after a part thereof had been performed; and that the American Title Guaranty Company was, after the passage of said order, required to charge the plaintiff for title insurance certificates, not the agreed price of $2.50 stipulated in the contract, but the substantial increase price fixed by the Board of Insurance Commissioners.

Upon such holding judgment was rendered that Tyrrell & Garth Investment Company be denied the relief sought against the defendants, and each of them.

From the judgment rendered the plaintiff has appealed to this court. Appellant's first assignment is as follows: "The trial court misconstrued the statute in giving it a retroactive operation instead of holding it to be prospective in its application, in so far as it permits the Board of Insurance Commissioners to prescribe rates. The statute should not properly be construed as intending to void a contract covering premiums on guar-

anteed titles and the issuance of certificates of title on a specific piece of property, which contract was entered into long prior to the passage of the act, and which the parties thereto had been long actively carrying out when the act became effective."

The majority of this court is of opinion that the assignment should be sustained.

The contract in controversy became effective on the 15th day of November, 1928, and at that time there was no law forbidding the making of same. Unquestionably appellant would have had the right, prior to the passage and taking effect of article 1302a, above mentioned, which did not take effect until February 27, 1929, and also prior to the promulgation of the order of the Insurance Board, which did not take effect until June 1, 1931, to enforce specific performance of the contract upon its tendering compliance with its terms, according to its very terms.

It is shown by the agreed statement of facts that prior to the order made by the Insurance Board, appellant Tyrrell & Garth Investment Company had paid to American Title Guaranty Company $2,700 in part performance of the contract, and that it had also for more than two years been actually performing other provisions thereof prior to the taking effect of the order of the Insurance Board.

In an opinion of this court, written by Chief Justice Pleasants, in the case of Texas & New Orleans Ry. Co. v. Wells-Fargo Express Co., 108 S. W. 172, 173, affirmed by the Supreme Court, Id., 101 Tex. 564, 110 S. W. 38, 40, it is said: "The general rule in the construction of legislative acts forbids a retroactive effect being given to an act, unless the intention that it shall so operate be explicitly stated in the act or is clearly shown by necessary implication from the language used in the act. Taylor v. Duncan, Dallam Dig. 514; Piedmont & Arlington Life Insurance Co. v. Ray, 50 Tex. 511; Mellinger v. Houston, 68 Tex. 37, 3 S. W. 249; Mottley v. Railway Co. (C. C.) 150 F. 406, 408. Under this rule, we do not think the act pleaded by defendants can be construed as applying to contracts made prior to its passage."

The contract in controversy by its terms was to continue in force until, and only until, a certain tract of land owned and subdivided by appellant, Tyrrell & Garth Investment Company, was sold.

The law relied upon by the Insurance Board for its authority to make and enforce its order of June, 1931, was, as before stated,

passed in 1929, after the contract in controversy had been executed and to considerable extent performed. The language employed in the statute fails to show that the Legislature intended that the law should have a retroactive effect, nor is such intent clearly shown by necessary implication from the language used in the act.

■ We do not hold that the Insurance Board by its order of June, 1931, was without authority to prohibit the Title Company from the issuance of insurance certificates on properties not covered by pre-existing contracts, such as the one in controversy, if it is made to appear from the language of the act under discussion that the Legislature intended that the law should have a retroactive effect, or if from the language used such intent is clearly shown by necessary implication. We do hold, however, that the law does not by the language used therein, nor by clear necessary implication, show that the Legislature intended by its enactment to give it a retroactive effect, so as to invalidate unquestioned valid contracts such as the one in controversy. It does not invalidate such contract, as held by the trial court, and therefore the contract in controversy, in our opinion, is still in force and effect and appellant is entitled to the relief sought by him.

It will be observed that the contract in controversy is not a contract by which the Title Company agrees to issue any and all certificates of insurance on lands owned by appellant, but that it covers only a specific piece of property. No other property is covered by the contract. So if appellant desired to have the title guaranteed on any property other than that described in the contract, the rate prescribed by the Insurance Board would apply.

In Texas & New Orleans Ry. Co. v. Wells-Fargo Express Co., supra, after stating the part which we have quoted, the court said: "Having reached this conclusion, it is unnecessary for us to pass upon the question of the constitutionality of the act, had the intention that it should operate retroactively been expressed therein."

And the Supreme Court, in affirming the judgment of this court, said: "The case is controlled, as was held by the courts below, by the well-established rule of construction that statutes cannot be held to have a retroactive or an ex post facto effect unless their language compels."

In Piedmont & Arlington Life Insurance Co. v. Ray, 50 Tex. 511, 519, it is said: "It is a well-settled rule that statutes are always held to operate prospectively, unless a contrary construction is evidently required by their plain and unequivocal language."

In Mellinger v. City of Houston, 68 Tex. 37, 3 S. W. 249, 251. Judge Stayton for the court said: "In the absence of constitutional restrictions upon the subject, it is almost universally accepted as a sound rule of construction that a statute shall have only a prospective operation, unless its terms show clearly a legislative intention that it shall have a retroactive effect."

In Boswell v. Security Mutual Life Ins. Co., 193 N. Y. 465, 86 N. E. 532, 19 L. R. A. (N. S.) 946, the Legislature of New York had passed an act (Laws N. Y. 1906, c. 326, § 33, amending Insurance Law § 97) that, "No domestic life insurance corporation shall in any calendar year after the year nineteen hundred and six expend or become liable for or permit any person, firm or corporation to expend on its behalf or under any agreement with it" more than certain stipulated percentages of premiums, etc., in the production of new insurance business, an obviously constitutional police regulation. The court said: "The first [question] is whether the plaintiff's contract with the defendant as to the rate of commissions, which had been in existence for nearly five years, and having about fourteen years to run, at the time section 97 of the insurance law was enacted, in 1906, is affected by said legislation to the extent of changing its provisions as to the amount of plaintiff's commissions and materially reducing them."

The Court of Appeals made an exhaustive review of the federal cases and the New York cases and announced its conclusion, saying: "We are of opinion that section 97 of the insurance law should not be construed as retroactive, and therefore it does not apply to the contract before us."

In 6 R. C. L. 193, the following rule is announced: "While there are no precise limits to the police powers, it is not, however, without its limitation, since it may not unreasonably invade private rights, or violate those rights which are guaranteed under federal or state constitutions. Accordingly, it is an established principle that the constitutional guaranty of the right of property protects it, not only from confiscation by legislative edicts, but also from any unjustifiable impairment or abridgment of that right."

For other authorities, see G., H. & S. A. Ry. Co. v. Wurzbach (Tex. Civ. App.) 189 S. W. 1006; G., C. & S. F. Ry. Co. v. Ellis, 70 Tex.

158

308, **7** S. W. 722; Owazarzak v. Ry. Co., 31 Tex. Civ. App. 229, 71 S. W. 793, 794; M., K & T. Ry. Co. v. Hudgins, 60 Tex. Civ. App. 344, 127 S. W. 1183; St. Louis S. W. Ry. Co. v. Mitchell-Crittenden Tie Co. (Tex. Civ. App.) 148 S. W. 1191; Gaertner v. Stolle (Tex. Civ. App.) 238 S. W. 252, 253.

Of course the act under discussion was passed under the asserted police powers, and all the cases cited by us call for a construction and operation of some statute enacted under the police power.

The law under discussion here, as before stated, gives no evidence of being intended as retroactive in so far as the controversy here is concerned. It provides in section 1 (Vernon's Ann. Civ. St. art. 1302a, § 1) that title companies "may be created" and "may exercise" certain powers in addition to those already granted them, etc., and (section 2, as amended by acts 1933, c. 222 [Vernon's Ann. Civ. St. art. 1302a, § 2]) "that no such corporation may hereafter acquire more than one abstract plant," etc., and "shall not hereafter" acquire any additional plant in any county of less than 90,000 inhabitants. It provides (section 3 [Vernon's Ann. Civ. St. art. 1302a, § 3]) that such companies "shall operate in Texas under the control and supervision and under such uniform rules and regulations as to forms of policies and underwriting contracts and premiums therefor, as may be from time to time prescribed by the Board of Insurance Commissioners of Texas," and that no company "shall be permitted to issue any title policy or mortgage certificate or underwriting contract on Texas property other than under this Act and under such rules and regulations." These are fair samples of the provisions of the act. There is nothing in the act that compels the conclusion that it is necessarily intended to be retroactive so as to interfere with an existing valid contract in course of performance as to rates or premiums already fixed on a specific piece of property. Such a construction of the act is not only not necessarily required by its terms, but such construction would immediately raise grave constitutional questions of the constitutional validity of the act as being not only retroactive legislation but legislation impairing the obligation of contracts. Such a construction would not only raise grave questions as to its constitutionality under the Constitution of Texas but under the Federal Constitution as well.

Discussions of retroactive laws are found in Slate v. City of Fort Worth (Tex. Civ. App.) 193 S. W. 1143, and Keith v. Guedry

(Tex. Civ. App.) 114 S. W. 392, at page 396; but the leading authority in this state, which all the other authorities cite and refer to, is Mellinger v. City of Houston, 68 Tex. 37, 3 S. W. 249, 252, by Justice Stayton.

It is there pointed out that the above-quoted constitutional provision of Texas protects as fully rights based on contract as does section 10, cl. 1, art. 1, of the Constitution of the United States. The latter provides that no state shall pass any ex post facto law or law impairing the obligation of contracts. But Justice Stayton further points out an obvious distinction between the two clauses, viz., that whereas our State Constitution (article 1, § 16) prohibits the enactment of retroactive legislation, the Constitution of the United States does not do so. And Justice Stayton points out that it has been constantly held that the section of the Constitution of the United States above referred to does not prohibit the passage of laws retroactive in character, even though such laws may divest antecedent vested rights of property, unless such rights be founded on contract. And he added: "It cannot be presumed that in adopting a constitution which contained a declaration 'that no retroactive law shall be made,' that it was intended to protect thereby only such rights as were protected by other declarations of the constitution which forbade the making of ex post facto laws, laws impairing the obligation of contract, or laws which would deprive a citizen of life, liberty, property, privileges, or immunities otherwise than by due course of the law of the land. * * * To give this protection against arbitrary legislation there was no necessity for the broader declaration 'that no retroactive law shall be made.' The making of it evidences an intention to place a further restriction on the power of the legislature; and it must be held to protect every right, although not strictly a right to property, which may accrue under existing laws prior to the passage of any, which, if permitted a retroactive effect, would take away the right. A right has been well defined to be a well-founded claim, and a well-founded claim means nothing more nor less than a claim recognized or secured by law."

That the police power is broad in its operation is no doubt true, but the state cannot use the police power in order to reach back and pass retroactive laws, or unreasonably use the police power to abrogate existing contracts, lawful when made.

If it can be held that it was the purpose of the Legislature to forbid the specific perform-

ance of such pre-existing, partially performed contracts, as the facts show the one in controversy to be, we would be constrained to hold such purpose unreasonable and unenforceable.

If the law is made to apply to the contract in controversy, as held by the trial court, so as to invalidate such contract, it would unquestionably destroy valuable vested rights of appellant, and this is regarded by us as unreasonable. In such case the courts must determine whether there be reasonable necessity for the enactment of the law in so far as it is applied by the trial court in the present case. Replogle v. City of Little Rock, 166 Ark. 617, 267 S. W. 353, 36 A. L. R. 1333; Town of Windsor v. Whitney, 95 Conn. 357, 111 A. 354, 12 A. L. R. 669.

It is apparent from what we have said and pointed out that we think the trial court erred in denying appellant the relief he sought, and that judgment should have been entered for it as prayed for.

Having reached the conclusions above stated, it is unnecessary for us to pass upon the question of the constitutionality of the act under discussion, had the intention that it should operate retroactively been expressed therein.

In view of what we have above pointed out, it becomes our duty to reverse the judgment of the trial court and here render judgment for appellant, awarding to it the relief prayed for in its petition, and it is accordingly so ordered.

Reversed and rendered.

GRAVES, Justice (concurring).

The dissent originally noted herein will now be confined to the single holding made by the court—that the act under review should not be construed as having been intended to abrogate pre-existing contract rates —and a concurrence in the judgment here rendered will be entered upon a wholly different consideration, that is: Since this court's decision in this cause was announced, our Supreme Court, in Travelers' Insurance Company v. Schuyler B. Marshall, Sr., 76 S.W.(2d) 1007, and several companion cases, has held —by necessary effect, as seems to me—that no statute, the objective and result of which is to have such ex post facto effect, can be validly passed under section 16, art. 1, of our State Constitution.

These conclusions in the order stated will be very briefly thus enlarged upon:

(1) From the wording of this act it seems apparent that the paramount purpose of the Legislature in passing it was to establish uniform rates as to title insurance, and, in furtherance thereof, that its equally clear intention was to make its provisions apply to all rates charged and all policies issued by title insurance companies within the state from and after the effective date of the law, some of the recitations to that purport being these (italicizing my own):

Section 3 (Vernon's Ann. Civ. St. art. 1302a, § 3). "Corporations so formed as well as foreign corporations and those created under Subdivision 57, Article 1302 of the Revised Statutes of 1925, * * * or any other law insofar as the business of either may be a title insurance business, shall operate in Texas under the control and supervision and *under such uniform rules and regulations as to forms of policies and underwriting contracts and premiums therefor, as may be from time to time prescribed by the Board of Insurance Commissioners of Texas.* * * * *Under no circumstances shall any rate of premium be charged for policies or underwriting contracts different from those fixed and promulgated by the Board, or those fixed in a final judgment of the Court as herein provided.*"

From section 5 (Vernon's Ann. Civ. St. art. 1302a, § 5): "Any foreign or domestic corporation issuing any form of policy or underwriting contracts or charging any premium rates to the public on either owners' or mortgagees' certificates or underwriting contracts on Texas properties other than forms and rates prescribed by the Board of Insurance Commissioners, hereunder, shall forfeit its right to do business in Texas. * * * *"

From section 24 (Vernon's Ann. Civ. St. art. 1302a, § 24): "The terms and provisions of this Act are conditions upon which corporations doing the business provided for herein may *continue to exist,* and failure to comply with any of them or a violation of any of the terms of this Act shall be proper cause for revocation of the permit and forfeiture of charter of a domestic corporation or the permit of a foreign corporation."

By necessary implication, it would seem to me, the Legislature must be held to have intended to abrogate all outstanding and existing contracts of title insurance charging other rates than those established by the Board of Insurance Commissioners; if so, by the elementary rules of statutory construction, the court should so construe the act as to carry

out that intention. 59 Corpus Juris, p. 948, par. 568.

The record shows that the Insurance Board itself—the agency created to administer the act—officially so interpreted the Legislature's meaning, and that fact is entitled to great weight. 9 Texas Jurisprudence, p. 439, par. 27; 59 Corpus Juris, p. 1025, par. 609, and cited cases.

(2) And if it was so intended by this measure from and after its passage to thus annul pre-existing title insurance contracts for the unexpired terms thereof, the Supreme Court's holding in the Moratorium Cases, supra, seems to me to necessarily require that such an application of it be held invalid as directly contravening article 1, § 16, prohibiting the enactment of any law impairing the obligation of contracts; the only ground upon which it is even contended that the Legislature might so regulate the title insurance business is that it was a proper exercise of the police power of the state with reference to a business "affected with a public interest," under the citation of such authorities as Ohio, etc., Co. v. P. U. Commission, 68 Colo. 137, 187 P. 1082; Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Hudson County Water Co. v. McCarter, 209 U. S. 349, 357, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; Louisville & N. Ry. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Chicago, B. & Q. Ry. Co. v. McGuire, 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328; Atlantic Coast Line Ry. Co. v. City of Goldsboro, 232 U. S. 548, 34 S. Ct. 364, 58 L. Ed. 721; Rail & River Coal Co. v. Yaple, 236 U. S. 338, 35 S. Ct. 359, 59 L. Ed. 607; Commonwealth v. Shenandoah River Light & P. Co., 135 Va. 47, 115 S. E. 695; Producers Trans. Co. v. Railroad Com. of California, 251 U. S. 228, 40 S. Ct. 131, 64 L. Ed. 239; Chicago, B. & Q. Ry. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94; State ex rel. Washington University v. Public Service, 308 Mo. 328, 272 S. W. 971.

But those authorities are all from other jurisdictions with constitutional provisions not on a complete parity with our own, in the opinion of our court of last resort, whose deliverances are binding upon us; that court, in the group of cases referred to, supra, in differentiating between the constitutional provisions in Texas and elsewhere on this subject, expressly and apparently unqualifiedly holds that with us the police power is subservient to and directly limited by the affirmative prohibition so declared in section 16 of article 1; it and everything else in the Bill of Rights being, by concluding section 29 thereof, declared to be "excepted out of the general powers of government, and shall forever remain inviolate."

It would therefore seem to make no difference in Texas whether the pre-existing contract so sought to be abrogated related to "a business affected with a public interest" or not.

Wherefore, while disagreeing as to the ground therefor stated in the opinion, I concur in the judgment herein rendered.

GRAVES, Justice (concurring on rehearing).

Since a rehearing herein has been denied, with the division in this court on the question discussed by its members upon the original hearing remaining the same, and since a new Attorney General of the state, and an able member of the bar as amicus curiæ, have appeared in arguments on the motion for rehearing, it is deemed appropriate for this addendum to be made to the former concurring opinion:

It was before pointed out that the Supreme Court of Texas in its recent decisions in what are known as the Moratorium Cases [the leading one being Travelers' Ins. Co. v. Marshall, 76 S.W.(2d) 1007, 1009], had held that the police power in Texas was subservient to section 16, art. 1, of our Bill of Rights, prohibiting the impairment of the obligation of contracts, and in that respect differed from the Constitutions of the United States and of many, if not all, the other states of the American Union; that opinion has now been officially reported, an abstract of it sufficient for the present purposes being as follows:

"Article 1 of the Constitution, comprising 29 sections, is designated the Bill of Rights, and consists of *express limitations of power*. The last section declares: 'Sec. 29. To guard against transgressions of the high powers herein delegated, we declare that everything in this "Bill of Rights" is *excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, * * * shall be void.*' (Italics ours.) * * *

"We are asked, however, to hold that, under the *police power*, one of the powers of government (State v. Coleman, 96 Conn. 190, 113 A. 385) vitalized by emergency conditions, the Legislature had the authority to pass the measure before us. We are asked to do this, although the Bill of Rights, section 16,

expressly prohibits the enactment of laws impairing the obligation of contracts. Can we do this? * * *

"Obviously all these questions must be answered in the negative. This is so because the pronouncements of the Constitution are 'imperious, supreme and paramount.' * * *

"On the concession, for the purposes of this decision, that the majority opinion in the Blaisdell Case [Home Bldg. & Loan Ass'n v. Blaisdell], 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, at the time it was delivered correctly interpreted the contract clause of the Federal Constitution in relation to the exercise of the police power by the states (article 1, § 10, cl. 1), it can have no application to the Constitution of Texas. *The Federal Constitution, it is said, contains no express limitations on the police power of the States* as such. 12 Corpus Juris, p. 928, § 440. The majority opinion in the Blaisdell Case, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, seems to be based upon the proposition that, although the contract clause in the Federal Constitution prohibits the impairment of contracts by state legislation, still a wide range of police control may be exercised by the states, varying with differing conditions, even to the extent of impairing previously existing contracts. 290 U. S. pages 434, 435, 439, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. It is quite obvious the same rule of interpretation cannot be applied to the contract clause in our State Constitution, for the reason that, unlike the Federal Constitution, the rights guaranteed by that clause (section 16, art. 1) are by section 29 of the Bill of Rights '*excepted out of the general powers of government, * * * and all laws contrary thereto, * * * shall be void.*' This is an express limitation on the police power which does not appear in the Federal Constitution, a limitation which plainly prohibits the enactment of legislation the effect of which is to impair the obligation of contracts. * * *

"We recognize, of course, that the police power is broad and comprehensive; but the Constitution forbids its exercise when the result would be the destruction of the rights, guaranties, privileges, and restraints excepted from the powers of government by the Bill of Rights.

"'However broad the scope of the police power, it is always subject to the rule that the legislature may not exercise any power that is expressly or impliedly forbidden to it by the state constitution.' 12 C. J. p. 929, § 440; Bell v. Hill (Tex. Sup.) 74 S.W.(2d) 120;

State ex rel. Cleveringa v. Klein, 63 N. D. 514, 249 N. W. 118, 86 A. L. R. 1523; Milkint v. McNeeley, 113 W. Va. 804, 169 S. E. 790, and other authorities supra.

"Since the impairment of the obligation of contracts is prohibited by section 16, article 1, of the Bill of Rights, *without any specified exception* in favor of legislative action to the contrary during industrial depressions or emergency periods, we are without power to write such an exception into the organic law."

So far as Texas is concerned, therefore, it is thus plainly held that neither the existence of an emergency, however great, nor the fact that any business is now strongly "affected with a public interest," can give the Legislature the power to override the express limitation upon the operation of the police power in Texas thus proclaimed in section 16 of article 1 of our State Constitution; nor have the learned counsel for any of the parties here either originally or upon rehearing cited any authorities holding to the contrary under a Constitution on a parity in this respect with our own in any state in the Union; on the contrary, the Constitutions of Missouri, Colorado, and Georgia, from which come three of the leading cases relied upon, all fail to so expressly make the police power subservient to their contract clauses, or else have none; the Supreme Court of the United States itself, as a review of its holdings on this subject will disclose, is always careful to say that the power of Congress expressly to prohibit and invalidate contracts, although previously made and valid when made, only exists when they interfere with the carrying out of the policy *Congress has the constitutional power to adopt;* that qualification is repeatedly reiterated in its very recent holding in the Gold-Clause Cases, Norman v. B. & O. Ry. Co. (U. S. v. Bankers' Trust Co.) 55 S. Ct. 407-427, 79 L. Ed. ——, in two cases; in such reiteration the case of Hudson County Water Co. v. McCarter, 209 U. S. 349, 357, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560, and Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 372, 375, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420, and many others, are relied upon.

Wherefore it is again respectfully submitted that the act here under review not only was intended to apply to pre-existing contracts, but that it directly contravened this express limitation upon legislative powers in article 1, § 16, of the Texas Constitution, and is therefore null and void.